# United States Court of Appeals

## For the First Circuit

---

No. 03-2441

UNITED STATES OF AMERICA,

Appellant,

v.

LAURENCE B. GREENBURG,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

---

Before

Selya, Lipez, and Howard, Circuit Judges.

---

Lori J. Holik, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellant.
Richard M. Egbert with whom Patricia A. DeJuneas was on brief,
for appellee.

---

June 3, 2005

---

**HOWARD**, **Circuit Judge**.  In January 2002, a federal grand jury returned a multi-count indictment against Laurence Greenburg and six other defendants stemming from allegations that these individuals participated in an illegal meat-packaging scheme operating from Woolf International Corp. ("Woolf") in Billerica, Massachusetts.  Greenburg subsequently moved to suppress evidence seized from Woolf's premises during a warrant search conducted by the United States Department of Agriculture ("USDA").  After a non-evidentiary hearing, the district court granted the motion on the ground that the warrant application did not establish probable cause for the search.  The government appealed.  See 18 U.S.C. § 1371.  The relevant facts are as follows.

In April 1998, federal agents executed a warrant to search Woolf's premises.  The warrant application was supported by an affidavit from Bernard Walter, a special agent for the Office of Inspector General of the USDA with fourteen years of experience investigating waste, fraud, and abuse perpetrated by USDA regulated entities.  Walter's affidavit provided the magistrate issuing the warrant with the following information.

Greenburg was an owner of Woolf, which makes and packages sandwiches containing meat products for sale to supermarkets, canteens, and convenience stores.  Woolf is regulated by the USDA's Food Safety and Inspection Service ("FSIS") and therefore must operate and maintain records according to USDA regulations.  As a

-2-

USDA regulated entity, Woolf was assigned an FSIS inspector who had complete access to Woolf's premises at all times. FSIS records indicated that Woolf had engaged in meat-packaging misconduct during the late 1980s.

On March 23, 1998, Walter met with a Woolf employee who provided a confidential tip about an illegal meat-repackaging operation that had been operating at Woolf for several years. According to the informant, the operation typically took place two days per week at approximately 4 p.m., after Woolf's lawful activities had concluded, the FSIS inspector had left the premises, and most Woolf employees had gone home.

As described by the informant, a tractor trailer would arrive after hours at the loading dock, which was used during normal hours to load the Woolf delivery truck. The trailer usually contained between twenty-five and thirty-five plastic-wrapped pallets, each containing twenty-five to thirty-five boxes of meat. The boxes came in sixty and forty-five pound sizes.

The repackaging procedure involved unloading the trailer and moving the boxes into the room used for repackaging. The room, which was not used for meat packaging during Woolf's normal hours, was not monitored by the FSIS inspector, was partially under construction, and had a dirty floor and debris falling from the ceiling. When the repackaging process was underway, the doors to this room were closed and all the windows were covered.

For each delivery, a Woolf employee opened the original boxes and exposed frozen, raw meat. The original boxes were date-stamped and marked with the USDA emblem. After the boxes were opened, different procedures were employed depending on the size of the box. With the sixty pound boxes, the top of the box was removed, a new top was placed on the box and date-stamped with a new date, and the box was resealed. This was called a "lid job."

With the forty-five pound boxes (which had no lids), the meat was completely removed and placed into a new box, which was then sealed and date-stamped with a new date. This was called a "box job." Sometimes during a box job, the meat fell onto the floor but was nevertheless repackaged.

The trailer would depart the Woolf premises after being unloaded. A second trailer was typically waiting at the Towne Plaza in Billerica. After the repackaging was complete, the boxes were reloaded onto the pallets, and someone at Woolf called the driver of the second trailer. The second trailer arrived at the loading dock, was loaded with the repackaged pallets, and drove away. The original lids and boxes were placed onto a Woolf truck and taken offsite for disposal.

The informant reported that approximately ten people worked on the repackaging operation, including Greenburg, who was often in charge. The informant was paid approximately $75.00 an hour for the repackaging work instead of the approximately $10.00 an hour he earned in regular employment for Woolf. Greenburg and

-4-

others told the informant that the repackaging operation was secret and constantly looked out of the windows during the process to make sure that no one was watching.

The informant told Walter that the next repackaging operation was scheduled on March 25, 1998 for sometime after 4 p.m. Based on the informant's tip, Walter conducted a surveillance of the Woolf premises. At 4:15 p.m. on March 25th, Walter observed a blue trailer at the Woolf loading dock. Approximately forty-five minutes later, this trailer left the loading dock. At 5:40 p.m., another trailer was observed parked at the Towne Plaza. Less than an hour later, this trailer arrived at the loading dock, and, after thirty minutes, drove away.

After this surveillance, Walter met with the informant and discussed what had just taken place. According to the informant, a trailer containing approximately twenty-three pallets holding sixty pound boxes of meat had arrived at Woolf at 4:15 p.m. All the pallets were unloaded and moved to the repackaging room. Woolf employees removed the lids (which were printed with the label "Chicago Packers") and replaced them with lids displaying the words "U.S. Department of Agriculture." The employees date-stamped the new lids with various dates in March 1998. The boxes were then reloaded onto the pallets. At approximately 6:30 p.m., another trailer arrived at the loading dock, was loaded with the repackaged meat, and departed. After this trailer left, the Woolf delivery truck was loaded with the old lids.

The informant told Walter that another repackaging operation was scheduled to begin at 2:30 p.m. on March 27, 1998 and that the boxes for this operation were hidden in an unmarked office across from the Woolf business offices. In light of this information, Walter conducted a second surveillance on March 27th. At approximately 2:30 p.m., a trailer arrived at the loading dock. At around 5:00 p.m., this trailer departed.

After concluding the surveillance, Walter met again with the informant, who stated that a trailer had arrived at the loading dock at approximately 2:30 p.m. containing twenty-five pallets of forty-five pound boxes of meat. Woolf employees unloaded the boxes and moved them into the repackaging room. The boxes were opened, and the meat was lifted out and put into new boxes. During the process, some of the meat fell onto the floor but was nevertheless repackaged. After the repackaging, the new boxes were sealed, date stamped, and reloaded onto the trailer. The trailer then left, and the old boxes were stored in a locked room for disposal at a later time. According to the informant, the old boxes appeared aged, dirty, and dried out. There were approximately nine hundred more boxes to be used in future repackaging operations concealed in the unmarked office across from the business office.

On April 3, 1998, a magistrate issued a warrant to search Woolf's premises based on Walter's affidavit. Several days later, federal agents executed the warrant and seized business records,

meat-packaging boxes, and several thousand pounds of meat. Based in part on the seized materials, Greenburg eventually was indicted on 64 counts of tax fraud, mail fraud, money laundering, and conspiring to engage in an illegal meat-packaging scheme.

Greenburg subsequently challenged the warrant on the ground that the affidavit failed to establish probable cause for the search because the affidavit did not provide a basis for the magistrate to assess the informant's credibility. The district court agreed and ordered the seized evidence suppressed. In making its ruling, the court focused primarily on Walter's failure to present the magistrate with information about Woolf's normal business operations. The court reasoned that, without such information, the magistrate could not assess whether the information that Walter learned during his surveillance was indicative of criminal activity or merely an observation of Woolf's normal activities. The district court also ruled that, because the corroboration for the search was inadequate, the <u>Leon</u> good faith exception did not apply. <u>See</u> <u>United States</u> v. <u>Leon</u>, 468 U.S. 897, 923 (1984).

The standard of review applicable to the government's appeal is well-established:

> We review <u>de</u> <u>novo</u> the district court's ultimate determination of whether a given set of facts constituted probable cause. Any factual findings are reviewed for clear error. In determining the sufficiency of an affidavit, we consider whether the totality of the circumstances stated in the

-7-

> affidavit demonstrates probable cause to
> search the premises.  We examine the
> affidavit in a practical, common-sense
> fashion and accord deference to reasonable
> inferences the [magistrate] may have drawn
> from the attested facts.  Under the
> probable cause standard, the totality of
> the circumstances disclosed in the
> supporting affidavits must demonstrate a
> fair probability that contraband or
> evidence of a crime will be found in a
> particular place.  In a doubtful or
> marginal case, the court defers to the
> issuing magistrate's determination of
> probable cause.

United States v. Barnard, 299 F.3d 90, 92-93 (1st Cir. 2002).

Where, as here, the basis for the magistrate's probable cause finding was information provided by an unnamed informant, the affidavit must provide some information from which the magistrate can assess the informant's credibility.  Id. at 93.  Many kinds of information may help establish credibility.  Among these are

> whether an affidavit supports the probable
> veracity or basis of knowledge of persons
> supplying hearsay information; whether the
> informant statements are self-authenticating;
> whether some or all of the informant's
> factual statements were corroborated wherever
> reasonable and practicable . . .; and whether
> a law enforcement affiant included a
> professional assessment of the facts related
> by the informant based on experience.

United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996) (internal citation omitted).  None of these factors is indispensable, and other indicia may be relevant.  See id.

In evaluating the informant's credibility, we first assess the manner in which the informant provided the tip.  Walter

-8-

met with the informant in person on several occasions. He therefore had the opportunity to question the informant personally about the tip and take measure of the informant's credibility. This sort of face-to-face contact between the agent and informant supports the informant's reliability. See United States v. Gabrio, 295 F.3d 880, 883 (8th Cir. 2002). Further, Walter knew the informant's identity and therefore could hold the informant responsible if he provided false information. This tends to establish an incentive for the informant to tell the truth. See Barnard, 299 F.3d at 93 (citing Florida v. J.L., 529 U.S. 266, 270 (2000)).

Greenburg complains that the informant had no track record of reliability. To be sure, evidence of the informant's prior credibility is relevant and in some cases may be all that is needed to establish probable cause. See United States v. Jordan, 999 F.2d 11, 14 (1st Cir. 1993). But an informant's tip can establish probable cause even though the affidavit does not contain information about the informant's past reliability. See, e.g., Barnard, 299 F.3d at 94.

We consider next the nature of the information provided. The informant supplied Walter with a detailed description of the repackaging scheme which the informant learned from personal observation. The informant described, with specificity, the area where the repackaging occurred, the repackaging procedures employed, the number of boxes per pallet, the weight of the boxes,

and the sequence in which the trailers arrived for loading and unloading. A specific, first-hand account of possible criminal activity is a hallmark of a credible tip. See Illinois v. Gates, 462 U.S. 213, 234 (1983); Barnard, 299 F.3d at 93; United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993); United States v. Caggiano, 899 F.2d 99, 102-03 (1st Cir. 1990). In addition, the informant implicated himself in the wrongdoing. When a self-incriminating statement is provided by an informant whose identity is known to the authorities, the statement is more likely to be true because of the risk inherent in making such a statement. See United States v. Harris, 403 U.S. 573, 583-84 (1971); see also 2 W. LaFave, Search & Seizure: A Treatise on the Fourth Amendment 126 (3d ed. 1996).

Greenburg contends that any positive inference to be drawn from these facts is undermined by a facial inconsistency within the warrant application. The warrant application contained a description of the Woolf premises provided by Albert Lamson, an FSIS investigator who was familiar with the Woolf building.[1] Lamson described the area where the repackaging allegedly occurred as "accessible solely through the blue doors on the loading dock located on the east side of the northern end of the building. There are no windows or other entrances/exits."

---

[1]Lamson was not the FSIS investigator responsible for Woolf at the time that the informant provided the tip. See infra at n.3.

Greenburg claims that this description is inconsistent with the informant's statement that the windows in the repackaging room were covered during the operation and thus shows that the informant was lying. As an initial matter, Lamson's description of the room is a bit unclear. It is not obvious that Lamson was describing the entire area where the repackaging took place; he could have been describing only the exterior of the room facing the loading dock. And in any event, magistrates making probable cause determinations act within short time constraints and consequently must read affidavits "in a practical, common sense fashion." Zayas-Diaz, 95 F.3d at 111. The informant's tip was internally consistent and supported by several indicia of reliability (or so the magistrate reasonably could have thought). That Greenburg may have identified an inconsistency between a portion of the informant's statement and Lamson's description of the repackaging room is not sufficiently compelling to call the magistrate's probable cause conclusion into doubt.[2]   See, e.g., United States v. Schaefer, 87 F.3d 562, 567 (1st Cir. 1996) ("When an informant's statement and the events he attempts to describe diverge in minor

_____

[2]Greenburg points to a second alleged inconsistency. The informant said that the repackaging took place in a room that was not monitored by the FSIS inspector. Greenburg claims that this is inconsistent with Lamson's ability to describe the room. There is no inconsistency here. The informant did not say that an inspector never entered the room where the repackaging took place; read in a common sense way, the informant was explaining that the inspector did not typically enter this room during his rounds. Moreover, Lamson's description was of the exterior of the room, which was capable of description without entry to the room's interior.

-11-

ways, the magistrate may reasonably choose to credit the [informant's] statements and disregard petty inconsistencies.").

Finally, we examine Walter's corroboration of the tip. The informant told Walter that a repackaging operation was scheduled to take place on March 25th after 4 p.m. From watching Woolf's premises, Walter observed the various trailers arriving at and leaving the loading dock just as the informant described. Walter also was able to confirm that a trailer was waiting at the Towne Plaza before arriving at the loading dock. Finally, Walter knew that, several years earlier, Woolf had been involved in questionable meat-packaging activities. See Taylor, 985 F.2d at 6 ("An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination.").

Echoing the district court, Greenburg says that this corroboration was insufficient because Walter failed to include information about Woolf's normal operations in the affidavit. Without this information, Greenburg contends, Walter did not know that he was observing illegal activity. This argument is based on a faulty premise.

"[C]orroboration of even innocent activity reported in the tip may support a finding of probable cause." United States v. Perez, 67 F.3d 1371, 1383 (9th Cir. 1995), rev'd in part on other grounds, 116 F.3d 840 (1997) (en banc); see also United States v. Dawkins, 17 F.3d 399, 404 (D.C. Cir. 1994) ("In some circumstances, it may be enough that law enforcement officers confirm the tips'

-12-

innocent detail."). Corroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip. See Gates, 462 U.S. at 243 n.13. The relevant inquiry is not whether "the particular conduct [observed] is innocent but the degree of suspicion that attached to particular types of noncriminal acts." Id. In light of the informant's specific description of the entire illegal scheme, Walter's observation of seemingly innocent truck movement, which matched the informant's prediction about such activity, helped establish a substantial reason to believe that the informant's description of the entire scheme was accurate.[3] Id. at 244 ("Because an informant is right about some things, he is more probably right about others.").

The task in assessing the informant's credibility is not to determine definitively whether the informant is lying or in error. See Khounsavanh, 113 F.3d 279, 284 (1st Cir. 1997). Rather, a probable cause finding may be based on an informant's tip so long as the probability of a lying or inaccurate informer has been sufficiently reduced. Id. The face-to-face contact between the

_____

[3]Greenburg also faults Walter for not interviewing the FSIS inspector responsible for Woolf in March 1998 and for not corroborating certain other facts provided by the informant. But Walter only needed to corroborate the tip to an extent "reasonable and practicable." Zayas-Diaz, 95 F.3d at 111. Moreover, there may well have been substantial reasons for not interviewing the FSIS inspector who could have been a potential suspect in the investigation. And a more aggressive surveillance might have caused the investigation to be discovered by the participants.

informant and the agent, the specific and self-incriminating nature of the tip, and the respectable amount of corroboration provided by Walter's investigation provided the magistrate with "a substantial basis upon which to conclude that there was a fair chance" that evidence of an illegal meat-packaging scheme would be found at Woolf.  Barnard, 299 F.3d at 95.[4]

**Reversed** and **remanded**.

---

[4]Because we conclude that there was probable cause for the search, we do not address the district court's Leon ruling.