U.S. v. Belton                          CR-04-192-JD  01/30/06  P

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


United States of America

        v.                              Criminal No. 04-cr-192-01-JD
                                        Opinion No. 2006 DNH 008
Bruce Belton


O R D E R


Bruce Belton has moved to suppress evidence allegedly seized from his home during the execution of a search warrant on the independent grounds that (1) the warrant application failed to demonstrate probable cause and (2) the application intentionally or recklessly omitted facts, which, if included, would have undermined the determination that probable cause existed. See Franks v. Delaware, 438 U.S. 154 (1978). The government objects, arguing that probable cause supported the warrant but, even if it did not, suppression is inappropriate by virtue of the good-faith exception. See United States v. Leon, 468 U.S. 897 (1984). The government also maintains that no Franks violation occurred. Over the government's objection, the court held an evidentiary hearing on the Franks aspect of the motion on January 4, 2006.


Background

The following facts are drawn from the affidavit submitted by New Hampshire State Trooper James J. Geraghty in support of

the search warrant ("Geraghty Aff."), except as otherwise noted.[1] Geraghty has worked as a detective in the state's Narcotics Investigation Unit since September, 1997, and spent eighteen months as a federal narcotics task force officer beginning in January 2000. During that time, Geraghty has worked drug cases exclusively, including major multi-state narcotics conspiracies, and has also served in an undercover capacity.

Geraghty assisted the Vermont Drug Task Force with its investigation of one Dennis W. Schofield, a member of the Freelancers motorcycle club who was suspected of distributing methamphetamine obtained from a source in New Hampshire. Trooper Kevin Lane served as the case agent on the investigation for the Vermont State Police. On September 18, 2003, police followed Schofield to the Harley Davidson retail outlet in Tilton, New Hampshire, where they observed him meeting with a man wearing Freelancers "colors" who was later identified as Belton. The authorities believed that Schofield had made the trip for the purpose of obtaining methamphetamine, also known as "meth" or "speed." The affidavit does not describe what, if anything, the police saw Belton and Schofield do during the meeting. The

---

[1]The balance of the facts are drawn from Geraghty's testimony at the Franks hearing, the affidavit he swore out in support of the government's objection to the hearing ("Second Geraghty Aff."), and the police reports appended to that affidavit and received into evidence at the hearing.

police trailed Belton as he left the Tilton outlets in his van, following him to the Northeast Vietnam Veterans Motorcycle Clubhouse, a supermarket, and finally his residence, all located in Franklin, New Hampshire.  Belton lives there at 3 Lilac Lane.

Four days after this meeting, on September 22, 2003, Schofield sold four grams of meth to an undercover agent of the Vermont Drug Task Force and "discussed his past and current deals . . . ."  Mem. Opp'n Franks Hrg. at 3.  During this discussion, Schofield said that he "used to get his meth at a much cheaper rate," but that his source of supply "at the time was from NH and they had recently [been] arrested."  Id.  According to Schofield, "2 guys were arrested for 5 pounds of meth and they cooperated and got another 5 pounds from their source of supply in Arizona."  Id.  Schofield added that "this new [source of supply] is not as good and it is more expensive . . . ."  Id.  None of this information about the events of September 23 was included in the warrant application.

On October 13, 2003, the undercover agent gave Schofield $1,000 to buy methamphetamine.  The police followed Schofield as he traveled from Vermont to Franklin, but "[s]urveillance was terminated approximately one (1) mile from BELTON's residence . . . due to the fact that [he] lives in a small trailer and vehicles would be easily detected in the immediate area."  Geraghty Aff. ¶ 4.  The next day, Schofield presented the

3

undercover officer with 5.5 grams of meth.

A report prepared by the undercover officer about this transaction reveals that he ultimately had to track Schofield down at his home around 3 p.m. on October 14 to retrieve the drugs, despite Schofield's representation that he would call the officer for that purpose while driving back from New Hampshire early that morning. These details were not included in the warrant application.

After taking an hiatus from his drug distribution activities because he suspected that he was being investigated, Schofield went back to selling meth.[2] On February 2, 2004, the undercover Vermont narcotics officer met with Schofield again to set up another methamphetamine buy. During the meeting, Schofield explained that he had yet to get in touch with his source of supply and used the agent's cell phone to attempt to contact the source. This attempt was unsuccessful--Schofield did not end up talking to anyone during the call--though the warrant application omits this detail. The application also fails to mention that, during his meeting with the undercover officer, Schofield said that he would be heading to New Hampshire to help a friend move

---

[2]The affidavit states simply that "[b]etween October 2003 and February 2003" the undercover agent learned that Schofield had stopped dealing drugs but that he resumed doing so "[a]fter a safe period of time had elapsed . . . ." The affidavit does not offer any more specific information on the temporal parameters of Schofield's break from distributing narcotics.

and that he would contact the officer when the source called.

The police later determined that the number Schofield had dialed belonged to a business, All Things Imprinted, run by Belton and located at the same address as his residence. The warrant application states that the authorities observed Schofield driving back toward Vermont "from the area of Franklin[,] New Hampshire" that night. In fact, though this detail was omitted from the warrant application, Schofield was five to ten miles away from Belton's residence at that point.

The warrant application also omits other details of the undercover officer's February 2 interaction with Schofield. In particular, the officer gave Schofield $1,000 to purchase methamphetamine when the two met at a private residence in Lebanon, where Schofield was helping the aforementioned friend move. Schofield said "he would be leaving that night and would contact [the officer] upon his return." He failed to do so, however, and the officer was not able to get in touch with Schofield until February 5, 2004. At that point, Schofield explained his failure to provide the methamphetamine as the result of having encountered a police roadblock on his way back to Vermont, which caused him to throw the drugs out of his car window. Schofield also said that police had used a dog to examine his car. After the police could not independently verify this tale, they decided to arrest Schofield, who ultimately

5

provided neither the methamphetamine nor the $1,000.

As the warrant application notes, the Vermont State Police took Schofield into custody on February 6, 2004. He was arraigned in the United States District Court for the District of Vermont three days later and subsequently released after he agreed to cooperate with the investigation of Belton.

While in custody, Schofield identified Belton as the source of his methamphetamine supply and reported that Belton "also sells cocaine." Geraghty Aff. ¶ 7. Schofield said that he had been buying speed from Belton since the summer of 2003, in quantities as large as a half-ounce of crystal methamphetamine for $1,900, but that Belton also sells crystal meth for $3,600 an ounce and $600 for an "eight ball," or eighth-ounce. Schofield explained that Belton is a founding member and former vice president of the Freelancers who "sells to patch wearing members" of that organization and the Vietnam Veterans Motorcycle Club. Id. According to Schofield, Belton "sells from his residence as well as the clubhouse" and "gets his methamphetamine from a place identified as 'The Store,'" known to Schofield only as such. Id. Although Schofield also recounted having seen an ounce of crystal meth at Belton's residence, the affidavit does not say whether Schofield related when, or how many times, that happened. A check of Schofield's phone revealed that he had received a call from Belton's number on January 31, 2004.

6

Following his apprehension, Schofield was willing to assist the authorities by making "controlled purchases" of methamphetamine from Belton, but believed that he would have to wait some time before attempting one because Schofield's recent arrest would likely make Belton suspicious of such a ruse. The Vermont State Police therefore "decided to delay any 'active cooperation' on Schofield's part." Second Geraghty Aff. ¶ 7. Although Geraghty was aware of these developments as they occurred, he did not mention them in the warrant application.

Through other New Hampshire State Police officers, Geraghty eventually confirmed Belton's association with the Freelancers. On June 21, 2004, the New Hampshire State Police received a call on its 1-800-NAB-DOPE hotline from an anonymous source, who reported that "Bruce Pelton," a motorcycle club president from Franklin, was selling speed. Geraghty believed that the tip confirmed what Schofield had told the police about Belton. In line with Geraghty's "aware[ness] that many honest people with legitimate information wish to remain anonymous for fear of reprisals," the caller explained that he would be in danger if he gave his name. Geraghty Aff. ¶ 14. According to Geraghty, motorcycle gangs dominate the methamphetamine trade and often intimidate those who might report their activities to law enforcement. In fact, the Freelancers had dispatched one of their members to attend the court proceedings on Schofield's case

and to obtain any papers filed in it, which were brought to the Freelancers' clubhouse the day after Schofield's arraignment on February 9, 2004.

On June 24, 2004, Geraghty called the Vermont Drug Task Force and learned that Schofield "ha[d] failed to actively cooperate with the investigation" of Belton and that Schofield "ha[d] subsequently been indicted and is currently awaiting trial." Geraghty Aff. ¶ 16. While Geraghty's affidavit in support of the warrant does not indicate when these events occurred, court records show that Schofield was indicted in the District of Vermont for a second time on April 15, 2004. The affidavit also does not mention Lane's statement to Geraghty that Belton "would not be indicted in Vermont unless [Schofield] came forward with his attorney and gave an in-depth proffer." Franks Hrg. Ex. A, at 14. When Geraghty applied for the warrant on June 30, 2004, he did state that the investigation of Belton "may be compromised by the fact that SCHOFIELD is no longer cooperating . . . . Any evidence that is at BELTON'S residence may be removed or destroyed if SCHOFIELD alerts BELTON to this investigation." Geraghty Aff. ¶ 17.

In his affidavit in support of the warrant, Geraghty explained at length how his training and experience had taught him that narcotics dealers often keep cash, weapons, drug paraphernalia, and other evidence of their activities in their

8

homes.  Geraghty Aff. ¶¶ 20-34.   He added that the evidence commonly includes records of drug transactions maintained long after those transactions take place.  Id. ¶¶ 20, 24, 29. Geraghty gave his "opinion that a search warrant is a vital tool necessary to obtain evidence, which is necessary for a successful prosecution of BRUCE BELTON.  There are currently no undercover officers or cooperating individuals that can make purchases of controlled drugs from BRUCE BELTON."  Id. ¶ 18.  The affidavit also noted that vehicles registered to Belton were observed at the subject address as recently as June 28, 2004.

Based on the information contained in Geraghty's affidavit, a justice of the Concord District Court issued a warrant on June 30, 2004, authorizing a search of Belton's residence at 3 Lilac Lane in Franklin for evidence of drug trafficking.[3]  The search, performed late that morning, turned up substantial quantities of methamphetamine and cocaine, as well as a triple-beam balance, three handguns, and $40,479 in cash.  A grand jury subsequently indicted Belton on charges of possessing and conspiring to distribute methamphetamine and possessing firearms in furtherance of drug trafficking and in spite of his status as a felon.


Discussion

---

[3]For the sake of consistency with the traditions of Fourth Amendment jurisprudence, the court will refer to the Concord District Court judge as "the magistrate."

9

The Fourth Amendment provides that "no [w]arrants shall issue, but upon probable cause . . . ." Pursuant to the exclusionary rule, "[t]he usual remedy for seizures made without probable cause is to exclude the evidence wrongfully seized . . . ." United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001) (citing Weeks v. United States, 232 U.S. 383, 391-93 (1914)). Nevertheless, because "[t]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates," Leon, 468 U.S. at 916, in most cases where "an officer acting with objective good faith has obtained a warrant from a judge or a magistrate and acted within its scope . . . . there is no police illegality and thus nothing to deter" by suppressing the evidence, even if the warrant issued without probable cause. Id. at 920. In such a case, then, the exclusionary rule does not apply. Id. at 922.

While maintaining that probable cause existed to support the issuance of the warrant, the government argues in the alternative that, even if probable cause was lacking, the police acted in good faith in securing and executing the warrant and that the evidence allegedly found should not be suppressed. As the government notes, "Leon allows the trial court, in its 'informed discretion,' to bypass the customary 'merits' inquiry into whether there existed a 'substantial basis' for the probable cause determination made by the issuing magistrate, and simply

10

decide whether the challenged search in all events came within the 'good faith' exception to the exclusionary rule." United States v. Zayas-Diaz, 95 F.3d 105, 112 (1st Cir. 1996) (quoting Leon, 468 U.S. at 925). The court agrees that such an approach is warranted here, given the absence of any of the countervailing "prudential considerations" identified by Leon. Id. at 112 n.8. The government bears the burden of showing that the good faith exception applies. United States v. Diehl, 276 F.3d 32, 42 (1st Cir. 2002) (citing Brunette, 256 F.3d at 19).

"[W]hile Leon restricts the application of the exclusionary rule, it does not eliminate it." United States v. Capozzi, 347 F.3d 327, 332 (1st Cir. 2003). Exclusion remains appropriate in certain circumstances, including where facts material to the decision to issue the warrant were intentionally or recklessly omitted from the affidavit submitted in support of it, or where "the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id.; see also Leon, 468 U.S. at 923; United States v. Brunette, 256 F.3d 14, 19 (1st Cir. 2001). Belton argues that both of these scenarios are present here. The court will address his contentions in turn.

11

I.  Whether Material Facts Were Intentionally or
    Recklessly Omitted from the Warrant Application

In <u>Franks</u>, the Supreme Court recognized a defendant's right to challenge "the veracity of a sworn statement used by police to procure a search warrant."  438 U.S. at 155.  To receive a hearing for this purpose, a defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, <u>and</u> [that] the allegedly false statement is necessary to the finding of probable cause . . . ."  <u>Id.</u> at 155-56.

The omission of a material fact from the affidavit supporting a warrant is treated as a false statement for purposes of the <u>Franks</u> analysis.  <u>United States v. Castillo</u>, 287 F.3d 21, 25 (1st Cir. 2002); <u>United States v. Charles</u>, 213 F.3d 10, 23 (1st Cir. 2000).  In the case of an omission, "suppression should be ordered only if the warrant application, . . . clarified by disclosure of previously withheld material, no longer demonstrates probable cause."  <u>United States v. Stewart</u>, 337 F.3d 103, 105 (1st Cir. 2003); <u>Castillo</u>, 287 F.3d at 25 n.4 ("With an omission, the inquiry is whether its inclusion in an affidavit would have led to a <u>negative</u> finding by the magistrate on probable cause.").  This court previously ruled that Belton's written submissions succeeded in making the "substantial preliminary showing" necessary to entitle him to a <u>Franks</u>

12

hearing.  438 U.S. at 155–56.  As the court stated at the hearing, however, this was simply a preliminary determination: "[w]hether [a defendant] will prevail at [the Franks hearing] is, of course, a different matter" from whether he is entitled to one."  Id. at 172.

Belton has identified several categories of information which, he argues, would have led the magistrate to refuse to find probable cause had they been included in the warrant application. The first of these consists of Schofield's statement on September 22, 2003, that he "used to get his meth at a much cheaper rate," but that his source of supply "at the time was from NH and they had recently [been] arrested" and that his "new [source of supply] is not as good."  Belton does not dispute that Schofield could have been referring to him as the "new" source.  Instead, he argues that the "recent" arrest of the former source could have occurred after Schofield's trip to New Hampshire to purchase methamphetamine on September 18 and that this bit of information tends to cast his meeting with Belton on that date in a more innocent light, i.e., Schofield could have gone to buy meth from the old source either before or after he met with Belton for another, legal purpose.

In the court's view, this is a strained interpretation of Schofield's statement.  Belton's reading would have Schofield's old source meet with him on September 18, then get arrested,

13

agree to cooperate with the authorities, and obtain methamphetamine from Arizona, all in enough time for Schofield to have learned about it by September 22.  The considerably more likely scenario is that the former supplier was arrested some time before Schofield's September 18 trip to New Hampshire--a fact which, as Belton acknowledges, "is neutral and would not necessarily provide the reviewer of the affidavit with relevant or necessary information; it's [*sic*] omission would not be material."  Mem. Supp. <u>Franks</u> Hrg. at [6].  Indeed, although Belton asked for a <u>Franks</u> hearing in part to ascertain the correct interpretation of Schofield's September 22 statement, <u>see id.</u>, he failed to adduce any evidence to that effect at the hearing itself.  Accordingly, the court determines that the September 22 statement was not relevant to the magistrate's probable cause determination.

Belton also argues that the application's description of the events of October 13 and 14, 2004--when the undercover officer provided Schofield with $1,000, and Schofield later provided the officer with a quantity of methamphetamine--creates the impression that the authorities "had no problem pinning down exactly when the drugs were purchased.  The reality is something quite different."  Mem. Supp. <u>Franks</u> Hrg. at [6-7].  In reality, although Schofield had said he would contact the undercover officer on his way back from his trip to New Hampshire to obtain

14

the meth in the early morning hours of October 14, he failed to do so, causing the officer to spend much of that day trying to track him down to pick up the drugs. Belton argues that this omitted information suggests that Schofield had ample opportunity to obtain the methamphetamine from another source, rather than during the trip to Belton's hometown of Franklin which is described in the warrant application.[4]

The problem with this argument is that Geraghty's affidavit candidly states that the undercover agent gave Schofield the cash on October 13 and that Schofield gave the agent the meth on October 14. Geraghty Aff. ¶ 4. As a result, the magistrate would have been aware of the passage of time between the delivery of the money and the delivery of the drugs and taken this fact into consideration in deciding whether the events of October 13 and 14 implicated Belton in Schofield's illicit conduct. While Geraghty's affidavit did not include everything the police knew about Schofield's actions on October 14, none of those actions (going to deliver wood, working on a tractor in his yard) readily suggests an opportunity to obtain the methamphetamine from

---

[4]Belton also points out that, while the affidavit states that the authorities terminated their surveillance of Schofield at a point approximately one mile from Belton's residence, Geraghty testified that the distance might have actually been between five and ten minutes from Belton's residence. The court attaches no significance to this discrepancy, if in fact it can properly be characterized as such. See Capozzi, 347 F.3d at 333 (noting that such "technical criticism of the form of [a warrant] affidavit is insufficient to undermine its veracity").

15

another source.[5]  Those details were therefore immaterial to the magistrate's probable cause determination.  See United States v. Higgins, 995 F.2d 1, 4 (1st Cir. 1993) (finding fact that informant unsuccessfully tried to buy drugs from defendant immaterial to probable cause to search defendant's home because "not necessarily inconsistent" with information that defendant later purchased quantity of drugs).

Belton also characterizes these details, as well as the rest of the omitted facts underlying his challenge to the warrant application, as tending to undermine Schofield's veracity.  In addition to Schofield's failure to call the undercover officer on the way back from New Hampshire on October 14 as he had promised, Belton points to the events of February 2, 2004, when the undercover officer again gave Schofield $1,000 to buy methamphetamine but he ultimately failed either to deliver the drugs or to return the cash.  As on October 13, when Schofield accepted the buy money on February 2, he indicated that he would call the undercover officer upon returning from New Hampshire,

_____

[5]Schofield called the undercover officer at 9:30 a.m. on October 14 and arranged for him to pick up the methamphetamine at Schofield's residence at noon.  When the officer arrived there at 1:30 p.m., Schofield's girlfriend said that he was not home, but that he had the meth with him; she also gave the officer directions to Schofield's location.  When the details of what the police knew of Schofield's actions on October 14 but omitted from the warrant application are considered in their entirety, then, it becomes clearer than they do not seriously call the probable cause determination into question.

16

but did not do so.  In fact, the undercover officer had no contact with Schofield until the officer called him on February 5, 2004.  Confronted during this call with his failure to provide the drugs, Schofield fabricated a story about a police roadblock that caused him to discard them--an apparent effort to cover up the fact that he had simply misappropriated the money.

Belton argues that these facts show that "Schofield is not and was not a credible informant.  He lied and deceived . . . ." Mem. Supp. Franks Hrg. at [10].  Given that Schofield was the only identifiable source of first-hand information about Belton's allegedly illegal activities, he argues that the inclusion of these facts in the warrant application would have therefore led the magistrate to find probable cause lacking.  Although the court shares Belton's view of the importance of Schofield's information to the probable cause ruling, it disagrees with Belton's ultimate conclusion in this regard.

As already discussed, Geraghty's affidavit clearly portrays Schofield as a drug dealer, describing both a consummated and a proposed sale of $1,000 in methamphetamine that he made unwittingly to an undercover police officer.  Geraghty testified at the Franks hearing that, based on his experience as a narcotics investigator, the details of Schofield's behavior which were omitted from the warrant application simply fit this profile.  Indeed, Geraghty explained that drug dealers often attempt to "rip off" customers who are believed to have no

17

recourse against them, as Schofield apparently attempted to do in accepting the undercover agent's money but failing either to provide the desired methamphetamine or to return the payment. It is likewise unsurprising that, unlike a responsible businessman, a drug dealer would neglect a promise to call one of his customers at an appointed time as Schofield did to the undercover agent on two occasions.

The omitted facts, then, would not have measurably contributed to the portrait of Schofield as a drug dealer--and, consequently, a potentially untrustworthy informant--which emerges from the warrant application. In that regard, this case is similar to United States v. Rumney, 867 F.2d 714 (1st Cir. 1989), where an informant falsely denied participating in a robbery during two separate police interviews but, after his arrest, admitted to driving the defendant to the crime scene. Id. at 716. The police later obtained a warrant to search the defendant's home based largely on an account of the informant's statements which omitted any reference to his initial denials of involvement or his criminal record. Id. The circuit concluded that these omissions would not have affected the magistrate's ruling that probable cause existed, reasoning that the informant's "credibility was not undercut merely because he made predictable denials until the police could produce evidence linking him to the robbery" or by his criminal record, which "explain[ed] in part why [the defendant] asked [the informant] to

18

participate in the robbery" in the first place.  Id. at 720.

Like the warrant application in Rumney, Geraghty's affidavit makes no secret of Schofield's criminality.  Thus, despite the omission of certain details of that criminality, the magistrate "issuing the search warrant[] would manifestly have been aware . . . that [Schofield] was not a model citizen" in considering his reliability as an informant.  United States v. Hall, 171 F.3d 1133, 1142 (8th Cir. 1999) (finding omission of informant's full criminal history and use of aliases from warrant application immaterial to probable cause determination where application mentioned her participation in prostitution and auto theft) (internal quotation marks omitted); see also United States v. Avery, 295 F.3d 1158, 1168 (10th Cir. 2002) (similar).

The First Circuit's decision in United States v. Vigeant, 176 F.3d 565 (1st Cir. 1999), on which Belton heavily relies, is not to the contrary.  There, among six other omissions identified by the circuit, the warrant application "neglected to mention the [informant's] long criminal history, his numerous aliases, his recent plea agreement, and other indicia of his unreliability." Id. at 573-74 (footnote omitted).  In concluding that these omissions were material, the circuit reasoned that they had deprived the magistrate of the opportunity to assess the "totality of the circumstances" underlying the probable cause determination.  Id. at 573 n.9 (internal quotation marks omitted).  The same cannot be said of Geraghty's affidavit in

19

this case, which, again, amply conveys that Schofield was distributing methamphetamine. The court therefore concludes that the details of the undercover agent's attempted February 2 drug buy and Schofield's failure to call the agent on October 14 as promised were not material to the probable cause finding.

Belton also argues that the relevant police reports, but not the warrant application, show that Schofield "recanted or at a minimum altered his position of cooperation." Mem. Supp. Franks Hrg. at [10]. As an initial matter, none of the evidence received in connection with the Franks hearing suggests that Schofield retracted any part of his February 6, 2004, statement inculpating Belton. Instead, while Schofield had agreed at that time to try to make controlled purchases of drugs from Belton, he ultimately "failed to actively cooperate with the investigation," Geraghty Aff. ¶ 15, leading to his indictment on April 15, 2004.

Although Geraghty's affidavit did not mention Schofield's initial willingness to attempt to make a controlled buy, its reference to the fact that Schofield failed to cooperate and was indicted as a result fairly indicates that he had, at some prior point, agreed to provide cooperation. The court therefore disagrees with Belton that the warrant application "omitted" the fact that Schofield "altered his position of cooperation."[6] In

---

[6]Similarly, even if Lane's statement to Geraghty that Belton would not be indicted in Vermont unless Schofield gave an in-depth proffer could be understood to mean that Schofield had refused to do so, such a refusal would not be inconsistent with

20

any event, such an omission would not be material to the probable cause finding, for the same reason that the omissions of the details of Schofield's October 14 and February 2 transactions with the undercover agent are not: that an admitted criminal would agree to cooperate with the authorities while in custody but fail to make good on that agreement following his release does not further diminish his reliability to any measurable degree.[7] See Rumney, 867 F.2d at 720.

Finally, even if the facts omitted from the warrant application were material, either individually or in the aggregate, that determination alone does not suffice to show that a Franks violation occurred. "Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990) (citing United States v. Reivich, 793 F.2d 957, 961 (8th Cir. 1986)); see also Indelicato v. United States, 106 F. Supp. 2d 151, 160-61 (D. Mass. 2000); United States v. Salemme, 978 F. Supp. 343, 349 (D. Mass. 1997); 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 4.4(b), at 545-46 (4th ed. 2004). The

Schofield's initial amenability to attempt controlled purchases from Belton.

[7]Indeed, Schofield might have simply gotten cold feet, given that a member of the Freelancers attended his arraignment on February 9, 2004, and that the club subsequently held meetings to discuss the future of Schofield's membership.

21

evidence adduced in connection with the Franks hearing does not support the conclusion that Geraghty acted with this requisite degree of animus in omitting any of the facts in question from the warrant application.

Geraghty convincingly testified at the hearing that, while he recognized the importance of Schofield's credibility to the probable cause determination, he left the information as to the attempt to rip off the undercover agent and the like out of the affidavit because he considered it unremarkable based on his experience investigating drug crimes.[8] As Geraghty put it, "it didn't seem important enough to say, 'Hey, this guy is a drug dealer and a liar'--I think the two go hand-in-hand." The case law on this subject discussed supra makes clear that, far from being reckless, this was a reasonable belief on Geraghty's part.

At the Franks hearing, Belton made much of the fact that Geraghty did not ask Lane for a copy of his investigative file before seeking the warrant and therefore left open the possibility that any exculpatory facts about Belton potentially noted in the reports would not make it into the warrant application. Though the better course might have been to obtain

---

[8]Geraghty explained that he would have included these facts in the affidavit if Schofield had behaved in that fashion while knowingly cooperating with the authorities, because they would have suggested a troubling disregard for necessary investigative protocol. Because Schofield was helping the police unwittingly, however, he was simply treating the undercover agent with the level of disregard common in dealer-user relationships, according to Geraghty.

22

the reports beforehand, Geraghty testified that he did send multiple drafts of his affidavit to Lane before submitting it. In any event, Franks does not provide for suppression "in instances where police have been merely negligent in checking or recording the facts relevant to a probable-cause determination." 438 U.S. at 170. The court therefore concludes that Geraghty did not intentionally or recklessly omit any material facts from the warrant application within the meaning of Franks, which in turn provides no obstacle to the government's reliance on the good faith exception here. Cf. Vigeant, 176 F.3d at 573-74 (refusing to apply good faith exception where affiant's "numerous omissions of material facts were at least reckless" and government "offer[ed] no rational explanation" for them).

II. Whether the Affidavit Is So Lacking in Indicia of Probable Cause as to Render Official Belief in Its Existence Entirely Unreasonable

Belton also contends that the government cannot rely on the good faith exception because Geraghty's affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923 (internal quotation marks omitted). Specifically, Belton argues that (1) the affidavit fails to establish Schofield's reliability as an informant and (2) in any event, neither Schofield's statement nor the other facts set forth in the affidavit show the requisite nexus between any illegal activity and Belton's home.

23

The court will consider these arguments in turn, keeping in mind that "the relevant question [is] 'whether a reasonably well-trained officer in [Geraghty's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" Vigeant, 176 F.3d at 572 (quoting Malley v. Briggs, 475 U.S. 335, 345 (1986)).

A.   Schofield's Credibility

The First Circuit has assembled a non-exhaustive list of factors to consider in evaluating probable cause where facts supporting the issuance of a warrant originate with an informant, including his or her apparent veracity or basis of knowledge, whether his or her statements are self-authenticating, the extent to which the statements were corroborated where reasonable and practicable, and any professional assessment of the probable significance of the statements made by the investigating authorities. Zayas-Diaz, 95 F.3d at 111; see also, e.g., Capozzi, 347 F.3d at 333; United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002). "'None of these factors is indispensable;' the ultimate issue is whether the totality of the circumstances establishes the credibility of the informant's story." Capozzi, 347 F.3d at 333 (quoting Zayas-Diaz, 95 F.3d at 111).

Belton argues that the circumstances here fail to show that the information provided by Schofield was, in fact, credible, particularly because (1) Schofield was an "unproven"

24

informant, (2) the "scant details" he provided cannot be considered self-authenticating, and (3) his account was not corroborated by independent police investigation in any significant respect. Taking Belton's points in order, the court notes that "an informant's tip can establish probable cause even though the affidavit does not contain information about the informant's past reliability" where it conveys other facts tending to establish his or her credibility. United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005).

In Greenburg, for example, though "the informant had no track record of reliability," the circuit treated the facts that the informant had met with the investigator face-to-face and that the investigator therefore knew the informant's identity as significant in bolstering his credibility. Id. The circuit reasoned that such a meeting provided "the opportunity to question the informant personally about the tip and take measure of [his] credibility" as well as to "hold [him] responsible if he provided false information." Id. This reasoning is similarly applicable here, where Schofield gave his account of Belton's allegedly illegal activities directly to Lane.

Belton also criticizes the level of detail about his allegedly illegal activities which Schofield provided, characterizing his account as a "general claim[] that [Belton] sells drugs." Mem. Supp. Mot. Suppress at [7]. As the

25

government points out, however, Schofield provided information as to the types of drugs Belton sold, at what prices, where he sold them from, and to whom. Schofield's statement therefore transcended "simply identifying [Belton] as a drug dealer." United States v. Benedict, 389 F. Supp. 2d 136, 140 (D.N.H. 2005) (DiClerico, J.) (rejecting similar challenge to credibility of informant whose story supported warrantless arrest).

Moreover, like the principal informant in Benedict, Schofield claimed to have come by his information about Belton's illegal activities through first-hand participation in them. 389 F. Supp. 2d at 141 ("'The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge,' particularly of 'concealed illegal activity as opposed to easily knowable, nonincriminating facts'") (quoting Barnard, 299 F.3d at 94). Also like his counterpart in Benedict, Schofield implicated himself in criminal conduct beyond what the authorities already knew, which "tend[s] to support [his] credibility, given the disincentive to falsely incriminate oneself." Id.

Furthermore, contrary to Belton's third criticism of Schofield's reliability, the authorities had independent information corroborating a number of aspects of his story. First, the police knew that Schofield had a relationship of some kind with Belton because they had observed the men meeting in

26

Tilton on one occasion, and knew from the undercover agent's cell phone and Schofield's own "caller ID" that he had placed and received calls from a phone number listed to Belton's business. Second, the authorities trailed Schofield to within just a short distance from Belton's residence after the undercover agent had given Schofield money to purchase methamphetamine on October 13, 2003, and spotted Schofield near Belton's hometown on February 2, 2004, after Schofield had placed a call to Belton's number in an apparent attempt to procure more meth.

It is true, as Belton points out, that the police never witnessed any inherently suspicious behavior on his part, or even confirmed that Schofield actually came into contact with Belton during either of the trips to New Hampshire which followed his meetings with the undercover agent. "But even '[c]orroboration of innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip.'" Benedict, 389 F. Supp. 2d at 142 (quoting Greenburg, 410 F.3d at 69). The activity which the police did observe dovetailed with what Schofield told them about his drug source both before and after his arrest and therefore helped to corroborate his statement inculpating Belton. "It is enough, for purposes of assessing probable cause, that corroboration through other sources of information reduced the chances of a reckless or prevaricating tale, thus providing a

27

substantial basis for crediting the [informant's] hearsay." <u>Illinois v. Gates</u>, 462 U.S. 213, 244-45 (1983) (internal quotation marks and bracketing omitted).

In sum, while each of Belton's criticisms of the affidavit's indicia of Schofield's credibility has some validity, the affidavit sets forth other aspects of Schofield's account which tend to bolster his veracity.  In any event, the deficiencies Belton identifies do not cast Schofield's information into sufficient doubt so as to render Geraghty's belief in the existence of probable cause entirely unreasonable.  "[An] officer need not . . . entirely eliminate the risk that an informant is lying or in error."[9]  <u>Capozzi</u>, 347 F.3d at 333 (internal quotation marks omitted).  Any shortcoming in this regard, then, is not glaring enough to prevent the government from relying on the good faith exception.

---

[9]Indeed, "the authorities need corroborate tips only insofar as it is "reasonable and practicable" to do so."  <u>Benedict</u>, 389 F. Supp. 2d 142 (quoting <u>Greenburg</u>, 410 F.3d at 69 n.3) (further internal quotation marks omitted).  As the warrant application explained, the police did not believe they could surveil Belton's residence without detection, due to the character of his neighborhood, and had no way to attempt a controlled buy from Belton once Schofield refused to cooperate.

B.    Nexus to Belton's Residence

Belton also contends that the information set forth in the warrant application fail to demonstrate probable cause that evidence of drug-related crimes would be found at his residence. "For evidence to avert suppression, normally the warrant application must demonstrate probable cause to believe that a particular person has committed a crime--the commission element--*and* that enumerated evidence relevant to the probable criminality likely is located at the place to be searched--the nexus element." Zayas-Diaz, 95 F.3d at 110-11 (internal quotation marks and citation omitted); see also Vigeant, 176 F.3d at 569. Belton argues that, in his case, "the nexus element is virtually non-existent," since the only information in the affidavit linking his home to any illegal activity was Schofield's "vague" statements that Belton "sold drugs from his residence" and that "he saw drugs" there.  Mem. Supp. Mot. Suppress at [3] & n.2.

The court notes at the outset that this argument rests on a narrow interpretation of Schofield's statement as set forth in the warrant application.  "In determining whether the nexus element is satisfied, a magistrate has to make 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Ribeiro, 397 F.3d 43,

29

48-49 (1st Cir. 2005) (quoting Gates, 462 U.S. at 238). The magistrate may draw reasonable inferences from the facts alleged in the warrant application in making this assessment. See United States v. Falon, 959 F.2d 1143, 1147 (1st Cir. 1992); United States v. Hershenow, 680 F.2d 847, 851 (1st Cir. 1982).

The warrant application relates Schofield's statements that he had been buying methamphetamine from Belton for several months; that Belton "sells from his residence as well as the clubhouse;"[10] and that "SCHOFIELD has seen an ounce of methamphetamine at BELTON's residence." Geraghty Aff. ¶ 7. While other inferences are possible, e.g., that Schofield had only seen meth at Belton's residence on one unspecified occasion, it is reasonable to infer from these facts that Schofield regularly bought methamphetamine from Belton at his residence. The information independently gathered by the authorities supports this inference: when Schofield attempted to purchase methamphetamine for the undercover officer, he either traveled into the vicinity of Belton's residence or called a phone number listed for that address.[11]

---

[10]It is unclear from the affidavit whether the "clubhouse" in question belongs to the Freelancers or the Vietnam Vets Motorcycle Club.

[11]Belton emphasizes that the phone number, registered to his business, was listed to a different street address in Franklin as well as to his home. A warrant application, however, need

"The probable-cause nexus between enumerated evidence of the crime and the place 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment, and normal inferences as to where a criminal would hide evidence of a crime.'" Ribeiro, 397 F.3d at 49 (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)) (bracketing omitted). Here, these considerations justify the inference that Belton kept evidence of his drug dealing at his residence. Indeed, Geraghty stated in his affidavit that, based on his training and experience, narcotics dealers often keep cash, weapons, drug paraphernalia, records of drug transactions, and other evidence of their activities in their homes. While "[a]lone, such generalized observations may not be enough to satisfy the nexus element," id. at 50 (citing cases), they do not stand alone in this instance, but are accompanied by the statement of an informant with first-hand knowledge of the connection, corroborated in material respects. See Zayas-Diaz, 95 F.3d at 112; cf. State v. Silvestri, 136 N.H. 522, 528 (1992) (reversing denial of motion to suppress based on insufficient probable cause for warrant for defendant's home where "there was nothing to indicate that evidence of the crime was kept at, or

demonstrate only '"a *fair probability* that contraband or evidence of a crime will be found in a particular place. Zayas-Diaz, 95 F.3d at 111 (quoting Gates, 462 U.S. at 238).

31

picked up from, the defendant's residence other than the mere fact that the defendant was suspected of being a criminal"), discussed in Mem. Supp. Mot. Suppress at [9]-[10].

Accordingly, the court concludes that a reasonably well-trained officer in Geraghty's position would have believed that his affidavit established probable cause to search Belton's residence for drugs and related evidence.  Again, while it may have been preferable for the police to extract more specifics from Schofield about the connection between 3 Lilac Lane and Belton's illicit dealings, the court believes that the affidavit contains enough information supporting the link to have reasonably convinced Geraghty that probable cause existed.  The warrant application, therefore, is not so lacking in indicia of probable cause as to preclude the government's reliance on the good faith exception.

Conclusion

For the foregoing reasons, Belton's motions to suppress (document nos. 14 and 36) are DENIED.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

January 30, 2006
cc:  Paul J. Garrity, Esquire
     Joseph N. Laplante, Esquire
     U.S. Probation
     U.S. Marshal