# United States Court of Appeals
## For the First Circuit

No. 03-2218

United States of America,

Appellee,

v.

Fernando Ribeiro,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

Anthony M. Cardinale, with whom Kimberly Homan was on brief, for appellant.

Cynthia A. Young, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

February 8, 2005

**LIPEZ**, <u>Circuit Judge</u>.  Fernando "Nando" Ribeiro was indicted on February 20, 2002, on eight counts charging various drug offenses.  On May 13, 2002, he filed a motion to suppress evidence seized during the execution of a search warrant for his apartment.  After a hearing, the district court denied the motion.  On February 11, 2003, Ribeiro entered a conditional guilty plea to all counts, permitting him to appeal the denial of his motion to suppress.  On August 18, 2003, he was sentenced to 180 months of imprisonment (after a downward departure for diminished capacity under U.S.S.G. § 5K2.13) and eight years of supervised release.[1]

Ribeiro raises two issues on appeal relating to the search of his apartment.  First, he argues that there was no probable cause for the search warrant.  Second, he argues that even if there was probable cause, the drugs found and seized by the police were not within the plain-view exception to the warrant requirement.

Ribeiro frames his specific legal arguments in the context of what he sees as a larger, growing problem in law enforcement -- a "new breed" of "documentary search warrants" for drug dealers' homes, which authorize searches for documents and drug paraphernalia, but not for drugs themselves.  According to Ribeiro, these warrants are supported mainly with generalized observations about drug dealers' habits (for example, that they frequently keep

---

[1] When Ribeiro was sentenced under the federal sentencing guidelines, they were mandatory.  <u>United States</u> v. <u>Booker</u>, 125 S. Ct. 738 (2005), later held them to be advisory only.

records of their illicit business in their homes), not specific observations.

Notwithstanding Ribeiro's disapproval of the kind of warrant used in this case, we find no error in its issuance or execution, and we affirm the district court's denial of the motion to suppress.

I.

On December 19, 2001, police officers executed a search warrant for Ribeiro's apartment at 60 Reservoir Street in Brockton, Massachusetts. The warrant did not authorize a search for drugs. Instead, it covered records, currency, baggies, and other drug paraphernalia. During their search, the officers found and seized bags of cocaine, heroin, "crack" cocaine,[2] and ecstasy, which they said were exposed to their plain view in the bottom of a speaker cabinet.

### The Affidavit

The warrant was based on an affidavit from Detective Joseph Gallarelli, a Boston police officer temporarily assigned to a Drug Enforcement Agency (DEA) task force that had been investigating the ecstasy trade in the Bridgewater, Massachusetts area since fall 2001. Det. Gallarelli's affidavit was based partly on information provided by a confidential informant, who said that Nando lived

---

[2] Crack cocaine's technical name is cocaine base; ecstasy's is 3,4 methylenedioxymethamphetamine, or MDMA.

near the "Foxy Lady," a strip club, and that he and his brother were known to deal drugs in the area.  The confidential informant made three controlled buys of ecstasy from Nando in October or November 2001.  At the time of the buys, the informant was accompanied by Det. John Silva III of the East Bridgewater Police Department, who like Gallarelli was temporarily assigned to the DEA task force.  Det. Silva did not participate in the buys.  Through surveillance, booking records from another jurisdiction, and records from the Massachusetts Registry of Motor Vehicles, the police determined that "Nando" indeed referred to Fernando Ribeiro, the defendant, and that he lived at 60 Reservoir Street.  Also, at times during their surveillance police saw Ribeiro driving two cars: a Mercedes, registered in his name, and a BMW, registered in his father's name.

The warrant was also based on four controlled buys of ecstasy tablets by Det. Silva, operating undercover, at a local restaurant. The first buy took place on November 20, 2001.  Det. Silva called the telephone number given by the informant (apparently a cell phone).  A man answering to the name "Nando" answered, and told Det. Silva to call back in fifteen minutes.  Det. Silva did so and explained that he had $1,000 and wanted to buy 100 ecstasy tablets. The two arranged to meet shortly at the Charlie Horse restaurant in West Bridgewater.  Police surveillance saw Ribeiro's Mercedes leave 60 Reservoir Street, and police saw the car arriving seven minutes

-4-

later at the Charlie Horse, but they did not observe Ribeiro while he was in transit. Det. Silva then bought from Ribeiro 100 tablets in a plastic baggie for $900; the tablets later field-tested positive for ecstasy.

On November 29, 2001, Det. Silva again called Ribeiro, seeking to arrange another purchase of ecstasy tablets at the Charlie Horse. Ribeiro said that he could be there in twenty minutes. At the time of the call, surveillance officers did not see the Mercedes or BMW parked outside 60 Reservoir Street. About twenty-six minutes after the call, Ribeiro pulled into the Charlie Horse parking lot in the BMW, where he met Det. Silva and again sold him 100 ecstasy tablets in a plastic baggie for $900.

On December 6, 2001, Det. Silva arranged for a third buy. The police established surveillance outside 60 Reservoir Street. At 3:55 p.m., Det. Silva called Ribeiro, and they arranged to meet at the Charlie Horse in ten minutes. At 4:15 p.m., Det. Silva called Ribeiro again and told him that he would be leaving in ten minutes. Minutes later, police surveillance saw Ribeiro walk out of the apartment building with a woman and child. After installing a baby seat in the BMW, Ribeiro drove away with the woman and baby in the car around 4:35 p.m. The police followed Ribeiro for a short distance but lost him in traffic; at about 4:44 p.m., Ribeiro pulled into the Charlie Horse's parking lot (with the woman and

child still in the car) and sold 100 ecstasy tablets in a plastic baggie to Det. Silva for $900.

On December 13, 2001, after several telephone calls back and forth between Det. Silva and Ribeiro, Ribeiro told Det. Silva that he could meet him at the Charlie Horse in fifteen minutes. About thirty minutes after that call, surveillance officers saw Ribeiro arrive at 60 Reservoir Street in the Mercedes. After another thirty minutes, officers saw Ribeiro drive away again; this time, they were able to follow him until his arrival at the Charlie Horse. Another $900 purchase of 100 ecstasy tablets in a baggie followed.

On December 19, 2001, Det. Gallarelli filed an application for a search warrant for Ribeiro's apartment at 60 Reservoir Street, with his affidavit attached. In addition to the details specific to Ribeiro (the three controlled buys by the confidential informant and the four by Det. Silva), Det. Gallarelli's affidavit also drew on his knowledge about drug crimes in general, distilled from his twelve years as a police officer. Since April 1999, Det. Gallarelli had been assigned to the DEA and had participated in a variety of drug investigations, from street-level dealers to large-scale traffickers and importers. As a way to tie Ribeiro's observed criminal activity to his residence, the affidavit stated:

> Based upon my training and experience, I know that drug traffickers find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside of the normal banking system. I also

know that drug traffickers frequently maintain books, records, receipts, notes, ledgers and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets. Such documents are generally maintained where they have ready access to them, such as at their residences. They also commonly keep addresses and telephone numbers in books or papers that reflect names, addresses, telephone numbers and/or paging numbers for their criminal associates. Drug traffickers usually keep paraphernalia for packaging, weighing and distributing controlled substances that may include but are not limited to baggies and packaging materials.

Before filing the application, Det. Gallarelli consulted an Assistant U.S. Attorney, who advised him that, while the police had collected enough information to get a so-called "documentary search warrant" for Ribeiro's apartment, they did not necessarily have enough to get a warrant to search for drugs themselves. Consequently, the warrant's proposed scope was limited to six categories of materials: (1) evidence showing control over the premises, like delivered mail; (2) U.S. currency; (3) evidence of proceeds from drug sales, and records of drug trafficking; (4) baggies and other drug paraphernalia; (5) cell phones; and (6) ledgers, notes, and other records relating to the drug trade, like telephone address books and receipts. The warrant issued that same day.

## The Search

Later on December 19, 2001, the police arrived outside 60 Reservoir Street to execute the search warrant. They did not enter immediately. About thirty minutes after they arrived, Ribeiro came

-7-

out of the building and was arrested. The police then entered the building and knocked on his apartment's door, which was opened by his eighteen-year-old girlfriend, Erika MacFadden, who had been nursing their two-week-old baby in the bedroom. There was also a five-month-old toy poodle in the apartment.

Ribeiro owned a large tower-type speaker cabinet, which sat unplugged on the floor of his bedroom. Inside the cabinet were two speaker units, stacked one on top of the other, with the lower unit approximately six inches from the ground. Each unit was supposed to be covered by a metal grill, which required a screwdriver to remove. Once a grill had been unscrewed and taken off, however, the speaker units were attached to the cabinet by simple clips and could thus be easily removed and quickly replaced. Ribeiro admitted that he unscrewed the bottom grill for easier access to the inside of the cabinet. A police officer entering the bedroom saw the lower speaker unclipped from the cabinet and hanging off to the side, thus exposing the cabinet's insides to plain view. In the space where the speaker normally belonged, the officer saw a large clear plastic bag filled with white powder, which later proved to be 200 grams of cocaine. The police seized the cocaine, as well as other bags also inside that contained 140 grams of heroin, seven grams of crack, and 6,000 ecstasy tablets. Elsewhere in the apartment, police found and seized scales, a laptop computer, plastic baggies, $65,000 in cash, and some identifying

documents (Ribeiro's driver's license and the apartment's rental agreement in his name).

## Ribeiro's Motion to Suppress

Ribeiro moved to suppress the drugs and other items seized by police, arguing that Det. Gallarelli's affidavit did not establish probable cause for a warrant to search for documents and drug paraphernalia, and that the seized drugs were not within the plain-view exception to the warrant requirement. In support of his motion, Ribeiro and his girlfriend offered testimony at the suppression hearing that conflicted with the police's version of the search. Ribeiro testified that, when he last left the apartment just before being arrested, the speaker had been clipped into the cabinet; the drugs, which he admitted storing there, were thus hidden from view. He testified that he was always careful to conceal his drugs because he did not want his girlfriend or mother, who sometimes visited to help with the new baby, to see evidence of his drug-dealing. He also testified that he would not have left his drugs exposed because he knew his puppy would surely have chewed up the bags and made a mess. MacFadden, Ribeiro's girlfriend, corroborated this testimony, saying that when the police knocked on the door, she was in the bedroom nursing the baby; when she got up to answer the door, the speaker was flush against the cabinet. She had never seen the speaker left hanging

open before, and she would have noticed if it had been open then with the bags of drugs visible inside.

The government's witnesses gave a different account. Det. John Khoury, of the Brockton, Massachusetts Police Department, was among five officers who entered Ribeiro's bedroom more or less simultaneously. He testified that when he entered the bedroom, he saw the bottom speaker unit unclipped from the cabinet and hanging off to the side, enabling him to see into the cabinet and exposing a bag of white powder to his view. After taking the bag out and examining it, he replaced the bag and asked Det. Gallarelli (who was still outside the building with Ribeiro) to join the search party in the bedroom. Det. Gallarelli arrived, examined the scene, and called the Assistant U.S. Attorney on the case (whom he had consulted about the warrant application) for advice on whether to proceed. The Assistant U.S. Attorney instructed the police to continue the search.

On October 29, 2002, the district court denied Ribeiro's motion to suppress, finding that Det. Gallarelli's affidavit adequately supported the issuance of the search warrant. The district court also found Silva's and Gallarelli's testimony "more credible" than Ribeiro's and MacFadden's. It therefore upheld the seizure of the drugs under the plain-view exception to the warrant requirement: the officers were legally authorized by the warrant to be in Ribeiro's bedroom looking for cash and drug-related

-10-

documents, and they saw the bag of white powder in plain view. As for Ribeiro's argument that the officers were using the documentary search warrant as a pretext to search for drugs, the district court said that while the police officers may have been hoping to find drugs, there is "no evidence that the scope of the search substantially exceeded a reasonable interpretation of its provisions."[3]

## II.

In reviewing a denial of a motion to suppress, a court of appeals reviews questions of law de novo and factual findings for clear error. United States v. Khounsavanh, 113 F.3d 279, 282 (1st Cir. 1997). In reviewing the affidavit supporting an application for a search warrant, we give significant deference to the magistrate judge's initial evaluation, reversing only if we see no "substantial basis" for concluding that probable cause existed. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999).

### A. Probable cause for the search warrant

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission'

---

[3] The district court added that, even if the drugs had not been in plain view, the warrant authorized the officers to open the speaker anyway. The speaker cabinet "stood out like a sore thumb in the room" and the police had seen such speakers used before as "hides" for contraband material, cash, and drug-related records. Without questioning the correctness of this analysis, we focus on the plain-view issue as an adequate basis for resolving this appeal.

element, and (2) enumerated evidence of the offense will be found at the place to be searched -- the so-called 'nexus' element." Id. In determining whether the nexus element is satisfied, a magistrate has to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Put differently, the application must give someone of "reasonable caution" reason to believe that evidence of a crime will be found at the place to be searched. Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality op.).

Ribeiro concedes that the government had probable cause to believe that he sold ecstasy (the crime) and that he lived in an apartment at 60 Reservoir Street (the place to be searched); he argues only that Det. Gallarelli's affidavit failed to demonstrate a nexus between the two. For example, Ribeiro criticizes the affidavit's lack of details about the confidential informant's three controlled buys from him. Further, Ribeiro notes that only once did the police manage to maintain constant surveillance over him from the time that he left his apartment till the time that he arrived at the Charlie Horse. Lastly, Ribeiro stresses that the affidavit showed him to be only a small-time street dealer, in contrast to the defendant in Feliz, who apparently operated as a successful drug dealer for twelve years and who had the ability to

-12-

sell as much as a kilogram of cocaine (worth about $22,000).  One can reasonably infer that such regular, large-scale traffickers would need to keep detailed accounts, customer lists, and money "in some safe yet accessible place," i.e., their homes.  Feliz, 182 F.3d at 87-88.  Ribeiro submits that the same reasoning does not apply to his case, at least on the facts set forth by the affidavit.

The government responds with five reasons why Gallarelli's affidavit provided sufficient facts from which the magistrate judge could infer that incriminating evidence would likely be found at Ribeiro's apartment.  First, surveillance suggested that Ribeiro drove directly from his apartment to the four controlled buys.  The police managed to tail him the whole way on one occasion, and on two other occasions they saw him leave 60 Reservoir and arrive at the Charlie Horse seven and nine minutes later.  Second, it was reasonable to suppose that Ribeiro needed to keep the cash he collected and used in his business in a "safe yet accessible place," id., which for him would be his home.  The affidavit established that Ribeiro had received $3,600 from police in their four deals, as well as additional sums from his transactions with the confidential informant.  Third, it was also reasonable to infer that a regular drug trafficker like Ribeiro kept records of his deals at his home, even if the affidavit did not show him to be a large-scale, long-time dealer as in Feliz.  Fourth, the affidavit

-13-

established that Ribeiro lived at 60 Reservoir and connected his drug-dealing to that apartment. Fifth, the magistrate judge properly credited Gallarelli's experience derived from numerous drug investigations, which made the affidavit more than just a bare-bones recitation of the officer's suspicions and conclusions.

The probable-cause nexus between enumerated evidence of the crime and the place "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979). Here, in going to the Charlie Horse's parking lot for the four controlled buys, Ribeiro left from his apartment three times and appeared to go directly to the rendezvous.[4] It is true, as Ribeiro stresses, that only once, on December 13, were police officers able to tail him the whole way. Two other times, however, Ribeiro was out of police sight for less than ten minutes, which suggests that he was not stopping along the way. Once, Ribeiro even brought his girlfriend and baby along for the ride from home, further suggesting the extent to which his drug dealing and home life were intertwined.

Also compelling is the readiness with which Ribeiro was able to supply Det. Silva's requests for ecstasy. Four times in three-

---

[4] On November 29, 2001, Ribeiro arrived at the Charlie Horse without appearing to have come directly from his apartment.

and-a-half weeks, Det. Silva was able to call Ribeiro and arrange to buy 100 tablets. Ribeiro never said that he would have trouble supplying those amounts; on three occasions, within about seventy minutes after Det. Silva's call, the two were able to meet for the transaction. On the days of those transactions, at least, Ribeiro had ecstasy in sufficient quantities to handle 100-tablet requests with no trouble.

Ribeiro's behavior leading up to the December 13 sale is especially probative of the relationship between his drug dealing and his home. That afternoon, after a few telephone calls back and forth between the two men (Ribeiro either did not answer or asked Det. Silva to call back later), Ribeiro finally said that he was ready to meet "in fifteen minutes." After this last conversation, which took place at about 6 p.m., Det. Silva drove to the Charlie Horse to wait. Around 6:30 p.m., surveillance saw Ribeiro pull up to 60 Reservoir Street, go inside for about thirty minutes, then leave and drive directly to the Charlie Horse, where he sold the ecstasy pills to Det. Silva. Although Ribeiro could have had other reasons for going home before meeting Silva, it is reasonable to think that he wanted to draw on a supply of ecstasy that he kept there.

The affidavit also established Ribeiro's need to store significant quantities of cash. At four controlled buys, Det. Silva handed Ribeiro a total of $3,600. A few weeks earlier,

-15-

Ribeiro had taken part in three other controlled buys from a confidential informant (for amounts of money unspecified in the affidavit), for a total of at least seven drug transactions in the last three months of 2001. Although this business was not on the scale of the defendant in Feliz (who, according to a confidential informant, had been regularly selling cocaine for twelve years), Ribeiro nevertheless accumulated a substantial amount of cash that he would have to keep in a "safe yet accessible place." Feliz, 182 F.3d at 87-88. It was reasonable to infer that Ribeiro would use his apartment for such needs.

The affidavit also includes observations drawn from Det. Gallarelli's general training and experience in drug cases -- namely, that drug traffickers frequently use their homes for storing cash and records relating to their illicit activity. See id.; Charest, 602 F.2d at 1017; United States v. McClellan, 165 F.3d 535, 546 (7th Cir. 1999) ("[I]n the case of drug dealers evidence is likely to be found where the dealers live.") (internal quotation marks and emphasis omitted). Alone, such generalized observations may not be enough to satisfy the nexus element. See, e.g., United States v. Schultz, 14 F.3d 1093, 1097 (6th Cir. 1994) (an officer's training and experience "cannot substitute for the lack of evidentiary nexus"); United States v. Benevento, 836 F.2d 60, 71 (2d Cir. 1987) (agent's expert opinion "standing alone, might not be sufficient to establish a link" between the place

-16-

searched and the criminal activity), abrogated on other grounds by United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989); see also United States v. Rosario, 918 F. Supp. 524, 528-30 (D.R.I. 1996); United States v. Rios, 881 F. Supp. 772, 775 (D. Conn. 1995). However, when combined with specific observations about Ribeiro's movements back and forth from his residence in relation to drug transactions, these general observations contribute significantly to the probable-cause determination.

Still, the facts of this case do provoke a question: why did the government seek a warrant authorizing a search only for documents and drug paraphernalia, and not for drugs themselves? We can find no sure answers in the record. Det. Gallarelli testified at the suppression hearing simply that: "It was determined by the U.S. Attorney's Office that we had enough to go ahead with a documentary search warrant, but maybe not necessarily enough to search for drugs." At oral argument, the government's attorney could not shed any more light on that determination, saying only that she believed that there was probable cause to search for drugs.

Of course, Ribeiro's explanation is that there was no probable cause to search for drugs, and that a documentary search warrant was a way around this problem -- a mere pretense, a way to justify the police's entry into the apartment, at which point they could go after what they really wanted. Moreover, Ribeiro envisions this

-17-

phenomenon as coming "dangerously close" to gutting the nexus requirement for searches of drug dealers' homes: "If the nexus requirement is to maintain its central role as a bulwark against unwarranted governmental intrusion into people's homes, then even searches of the homes of putative drug dealers must rest upon something more than mere supposition and boilerplate."

This disparagement of Det. Gallarelli's reliance on his training and experience in drug cases as "boilerplate" -- i.e., "stereotyped or formulaic writing" -- is unpersuasive. 2 Oxford English Dictionary 363 (2d ed. 1989).[5] Sometimes formulations become boilerplate because they are so often true and relevant. It would be perverse for a court, bound to undertake an analysis of "fair probability," <u>Gates</u>, 462 U.S. at 238, to ignore such statements because of their broad applicability. Moreover, Ribeiro does not cite any cases or secondary sources to support his theory about the abuses of documentary search warrants.[6]

Certainly this kind of warrant (without the characterization) is known in the case law. See, <u>e.g.</u>, <u>Feliz</u>, 182 F.3d at 88; <u>United</u>

---

[5] The term originally referred to the thick iron plates used in building steam boilers, whereas "the modern sense comes from the use of the term to refer to copy set on printing plates (or molds to make the plates) and distributed in that form to newspapers. The copy could not be edited." Black's Law Dictionary 185 (8th ed. 2004). Lawyers then borrowed the term.

[6] A search on Westlaw for the term "documentary search warrant" (in quotation marks) in all federal and state cases produced zero hits. (Now, presumably, there will be one.)

States v. Thomas, 989 F.2d 1252, 1254 (D.C. Cir. 1993) (warrant authorized police to search for "books, ledgers, records and other documents," as well as the clothing worn by the defendant during sale to undercover officer earlier that day); United States v. Williams, 974 F.2d 480, 481-82 (4th Cir. 1992) (per curiam) (affidavit establishing that known drug dealer currently resided in a motel room was sufficient to support warrant for records, documents, money, and paraphernalia used in the sale and distribution of narcotics); United States v. Gonzalez, 940 F.2d 1413, 1419-20 (11th Cir. 1991) (warrant for "documents and United States currency related to the illegal importation and distribution of controlled substances"). Although none of these cases use the term "documentary search warrant" or refer to it as a concept, their discussion of warrants comparable to the one here belies any claim that the warrant reflects a new phenomenon.

In the final analysis, we do not have to determine why the government concluded that it might not have probable cause to search for drugs in Ribeiro's apartment. The determinative question is whether it established probable cause for the search warrant it obtained. On that point we have no reservations. This is not a case where the issuance of the warrant was based only on Det. Gallarelli's general knowledge and experience. Here, the police observed Ribeiro on several occasions when it was virtually certain that he left his residence carrying the ecstasy tablets

-19-

that he would presently sell to Det. Silva. Given those observations, there was probable cause to think that police would find in Ribeiro's apartment the incriminating evidence listed in the affidavit: hundreds or thousands of dollars in cash, baggies (like the ones Ribeiro's ecstasy came packaged in) and other packaging materials, and records relating to Ribeiro's regular drug sales, like receipts from past sales or telephone address books with customers' names. The details of Ribeiro's sales derived from police surveillance, when combined with the generalities of the illicit drug trade attested to by Det. Gallarelli, provided a sufficient basis for the magistrate judge's finding of probable cause to issue the search warrant.[7]

## B. Plain-view exception to the warrant requirement

Ribeiro offers a fair statement of the plain-view issue in this case: "The plain-view issue . . . , assuming that the Court concludes that the warrant was supported by probable cause, can be simply expressed: was the speaker hanging out of the cabinet, permitting a view into the interior of the cabinet, when the officers entered Ribeiro's bedroom or did one of them, as Ribeiro contended, remove the speaker from the cabinet themselves?" Ribeiro then claims that the resolution of this issue involves more

---

[7] Because we find that the warrant was supported by probable cause, we do not reach the government's alternative argument based on the good-faith exception of United States v. Leon, 468 U.S. 897 (1984).

-20-

than a simple credibility contest between the police, on the one hand, and Ribeiro and his girlfriend, on the other. To convince us, he offers a number of creative arguments and alternative theories about why he would not have done what the government says he did. We are unpersuaded.

First, in a familiar note, Ribeiro dismisses the documentary search warrant as a mere pretense because the police intended to search for drugs from the outset. Ribeiro emphasizes that the police asked him where his drugs were immediately upon arrest, and the officers in the apartment asked his girlfriend the same question. As the district court correctly noted, however, this argument is a dead-end. As long as the search was within the scope of the warrant, it is no matter that the officers may have hoped to find drugs:

> The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.

Horton v. California, 496 U.S. 128, 138-39 (1990); see also United States v. Robles, 45 F.3d 1, 6 n.3 (1st Cir. 1995) ("'inadvertence' is not a necessary condition of a plain view seizure"); United States v. Giannetta, 909 F.2d 571, 578 n.6 (1st Cir. 1990) (same).

Second, Ribeiro claims that it simply "defies belief" that he would have left the drugs in plain view because (1) he wanted to keep his girlfriend ignorant of his dealing and (2) more

-21-

importantly, he had a "young puppy in the apartment known for chewing up everything in sight."  If he had left the speaker open, "the result would likely be a dead puppy and ruined drugs."  The reality is that people can be careless.  That fact did not require the district court to reject the testimony of the police officers.

Third, although Det. Khoury testified that he did not remove the speaker cover, Ribeiro faults the government for not disproving the possibility that another officer may have done so before Khoury entered the room.  The government's burden to prove its entitlement to the plain-view exception[8] does not mean, however, that it must disprove all of the defendant's alternative theories, no matter how speculative or implausible.  Based on Det. Khoury's testimony, the district court found that he and the other officers entered the room "more or less simultaneously."  Ribeiro's sheer speculation aside, there is nothing to suggest that the district court's finding was clearly erroneous or that the police officers had time for the shenanigans that he suggests.

**Affirmed**.

---

[8] <u>United States</u> v. <u>Rutkowski</u>, 877 F.2d 139, 141 (1st Cir. 1989) ("The government, of course, has the burden of establishing entitlement to the exception . . . .").