# United States Court of Appeals
## For the First Circuit

No. 14-1124

UNITED STATES OF AMERICA,

Appellee,

v.

SAMUEL DIXON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Howard, Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, for appellant.
Crystal S. Yang, Special Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.

May 22, 2015

**HOWARD, Circuit Judge**. Defendant Samuel Dixon was convicted of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) after police executed a search warrant for his apartment and found a pistol and eight rounds of ammunition. Dixon appeals his conviction on several bases. First, he argues that the affidavit used to support the search of his person and apartment was insufficient to establish probable cause and so the trial court erred in denying his motion to suppress. Second, he argues that his conviction violates the Commerce Clause because the government did not prove the interstate commerce element of the felon-in-possession charge and so the court erred in denying his motion for judgment of acquittal. Third, he argues that the district court's jury instructions concerning the interstate commerce element were erroneous. We find no merit in his arguments and affirm.

I.

On February 11, 2011, Boston Police Detective Michael Ross filed an affidavit in support of two search warrants: one for Dixon's person and one for 12 York Street, Apartment 1 in the Dorchester neighborhood of Boston. The affidavit first recounted Detective Ross's extensive experience with drug investigations, then detailed his investigation into a suspected drug trafficking scheme in the Dorchester/Roxbury area.

The affidavit noted that Ross had received information from a confidential informant (CI) "[w]ithin the last few months" that a black male with short hair who was approximately forty years old, six feet tall, and 200 pounds was selling crack cocaine in that area. The CI had purchased crack cocaine from that man in the past. The CI provided Ross with the phone number he had used to contact the suspect and purchase drugs. The CI also told Ross that the suspect drove a red Ford SUV.

The affidavit stated that this CI had provided Ross's unit with "reliable information in the past that ha[d] led to the arrests and convictions of individual(s) for violation of the drug laws and also the seizure of drug(s), money, firearm(s) and ammunition." Ross explained that he had intentionally excluded details about those prior investigations from the affidavit in order to protect the CI from harm and ensure that the Boston police would be able to "cultivate future informants."

The affidavit then detailed a series of controlled buys during which the CI had purchased what appeared to be drugs from the suspect. During the first controlled buy, which took place "[w]ithin the last few months," officers searched the CI to establish that he was free of contraband or money, then had him call the suspect to arrange a purchase. Officers provided the CI with money, and the CI then proceeded to a "meet location." The police followed the CI and observed the suspect's arrival.

Officers watched the suspect make an exchange with the CI following a brief conversation and then followed the suspect to York Street in Dorchester. The CI reconvened with Ross and gave him the substance that he had purchased. Ross's "training and experience led [him] to believe the items(s) handed to [him] by [the CI] was a quantity of crack cocaine."

Two additional, nearly identical controlled buys were conducted, one "[w]ithin the last couple of months" and one "[w]ithin the last ninety-six hours." Before the latter two buys, officers followed the suspect from 12 York Street to the meet location and also followed him back to York Street after the transaction concluded. The affidavit did not say that the officers saw an exchange between the CI and the suspect during either of the later buys, but afterward the CI handed Ross a substance that Ross believed was crack cocaine.

The affidavit described other efforts to confirm the CI's information. After the first controlled buy, Ross observed a red Ford Expedition, matching the CI's description of the suspect's vehicle, parked in the driveway at 12 York Street. Ross ran the Ford's plates and determined that it belonged to a man named Samuel Dixon, age 43, with an address of 12 York Street, Apartment 1. With that name in hand, Ross obtained a photograph of Dixon, and the CI identified him as the person from whom he had purchased cocaine. Dixon's driver's license listed his address as 12 York

Street, Apartment 1, and Ross observed Dixon driving the red Ford SUV in the area on several occasions. Ross also called the telephone number that the CI had provided, which directed him to the voicemail of "Mr. Dixon." Finally, Ross confirmed with the area utility provider that Dixon was the listed subscriber at 12 York Street, Apartment 1, with a phone number matching the one the CI had provided.

As to Dixon's apartment, the affidavit stated that, based on Ross's "training and experience" and the three controlled buys, and based on his observations of Dixon "entering and/or exiting 12 York St. . . . before and/or after the purchases of crack cocaine," Ross believed Dixon was "conducting a delivery service of crack cocaine" and using his apartment "as his base of operation." Ross "believe[d] items used in the cooking, packaging and sale of crack cocaine" would be found there.

The two warrants were issued on February 11, 2011, and executed on February 16, 2011. Police stopped Dixon in his Ford Expedition less than a mile away from 12 York Street and informed him of the warrant. They searched Dixon, found no contraband, and took him to his apartment. Once there, the officers gave Dixon <u>Miranda</u> warnings and asked him if there were drugs or firearms in the apartment. He told them that there were drugs in his dresser and a firearm in either a toilet or his closet. The officers

searched these locations and found drugs, drug paraphernalia, a firearm, and ammunition.

Dixon was charged with possession with intent to distribute cocaine, see 21 U.S.C. § 841(a), and being a felon in possession of a firearm and ammunition, see 18 U.S.C. § 922(g)(1). He moved to suppress the fruits of the search on the same grounds he raises here -- that the affidavit lacked sufficient facts to satisfy the probable cause requirement -- but the district court denied the motion.[1] Dixon was tried on the firearm charge and convicted by a jury.[2] This appeal followed.

II.

Our review of a district court's denial of a motion to suppress is plenary. United States v. McCarthy, 77 F.3d 522, 529 (1st Cir. 1996). Where our independent assessment of a suppression motion requires us to review the sufficiency of an affidavit supporting a search warrant, however, we afford an ample amount of deference to the issuing magistrate's finding of probable cause. See United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005); see also Illinois v. Gates, 462 U.S. 213, 236 (1983) ("[W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo

_____

[1] Dixon also moved for a Franks hearing. On appeal he does not challenge the district court's denial of that motion.

[2] The government dismissed the drug charge before trial.

-6-

review."). Accordingly, we will reverse "the magistrate judge's initial evaluation . . . only if we see no substantial basis for concluding that probable cause existed." Ribeiro, 397 F.3d at 48 (internal quotation marks omitted).

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched -- the so-called 'nexus' element." United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999). "Where, as here, the basis for the magistrate's probable cause finding was information provided by an unnamed information, the affidavit must provide some information from which the magistrate can assess the informant's credibility." United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005).

Our inquiry is a "practical, common-sense" one, Feliz, 182 F.3d at 86 (quoting Gates, 462 U.S. at 238), that takes into account the "totality of the circumstances," United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir. 1997) (internal quotation marks omitted). "[T]he facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." Feliz, 182 F.3d at 86 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). "Probable cause does not require either certainty or an unusually high degree of assurance." United States v. Clark, 685 F.3d 72, 76 (1st Cir.

-7-

2012). Rather, "[p]robability is the touchstone." Khounsavanh, 113 F.3d at 283 (quoting United States v. Aguirre, 839 F.2d 854, 857 (1st Cir. 1988)) (internal quotation marks omitted).

Dixon's basic argument is that the affidavit was not specific enough as to the informant's reliability or the conclusions that Dixon had committed a crime or that drugs would be found at the York Street apartment. He also faults the failure to do a field test.

We are satisfied that Ross's affidavit was sufficient to provide probable cause as to both the commission and nexus elements. The affidavit provided numerous facts from which a magistrate could have easily concluded that the CI who advised Ross of Dixon's illegal drug sales was credible. First, Ross "met with the informant in person on several occasions. . . . This sort of face-to-face contact between the agent and informant supports the informant's reliability." Greenburg, 410 F.3d at 67. Second, the CI had given Ross fruitful tips in the past. See, e.g., United States v. Tiem Trinh, 665 F.3d 1, 10-11 (1st Cir. 2011). Third, because of Ross's extensive contact with the CI, Ross would have been able to hold the CI responsible had he provided false information, which created an incentive for the CI to tell the truth. See id.; Greenburg, 410 F.3d at 67. Fourth, the CI, in describing his purchases from Dixon, provided "[a] specific, first-hand account of possible criminal activity" -- "a hallmark of a

credible tip" -- and in doing so "implicated himself in the wrongdoing." Greenburg, 410 F.3d at 67-68.

Fifth, Ross independently corroborated facts that he had learned from the CI. "'[C]orroboration of even innocent activity reported in the tip may support a finding of probable cause.'" Id. at 69 (alteration in original) (quoting United States v. Perez, 67 F.3d 1371, 1383 (9th Cir. 1995)). Here, not only did Ross corroborate innocent facts about Dixon -- such as, for example, his phone number and the type of car he drove -- he also corroborated the CI's statement that Dixon sold drugs through the three controlled buys, which were carefully monitored and regulated to minimize the chance that the CI could have falsely implicated Dixon. "[A] properly conducted controlled buy is formidable evidence to support a search." United States v. Genao, 281 F.3d 305, 308 (1st Cir. 2002). A field test of the substance suspected to be illegal drugs is not per se required. See United States v. Dessesaure, 429 F.3d 359, 368-69 (1st Cir. 2005).

Finally, Ross was highly experienced in the drug trafficking field, having participated in over 1000 drug investigations during his sixteen-year tenure in the Boston police Department. "[T]he issuing judge making a probable cause determination 'may credit the experience and pertinent expertise of a law enforcement affiant in evaluating the authenticity of the informant's description of the target's modus operandi.'" Tiem

Trinh, 665 F.3d at 12-13 (quoting United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993)).  Ross's extensive experience buttresses our conclusion that the magistrate reasonably found that the CI's information was reliable.  See id.

The magistrate judge did not err in concluding that there was a reasonable probability that evidence of Dixon's criminal activity would be found at 12 York Street, Apartment 1.[3]  Dixon was registered for utilities there, his driver's license listed that address as his residence, and Ross saw him driving around the residence on numerous occasions.  In drug cases, there is often probable cause to believe that evidence of the crime will be found where the suspected drug dealer lives, at least where, as here, "[n]o other residence or drug-dealing headquarters of [the defendant's has been] identified."  See Feliz, 182 F.3d at 88. Here there is even more.  Officers observed Dixon returning to 12 York Street immediately after all three controlled buys and observed him leaving there to go to the last two controlled buys. There was ample probable cause to believe that Dixon kept drug-related materials at his York Street apartment.  See Ribeiro, 397 F.3d at 52.

Dixon protests that the affidavit "reported no observations of [him] carrying anything from or into the building"

_____

[3] Dixon does not challenge the nexus between Ross's affidavit and the warrant to search his person.

-10-

and "contained no observations of [him] engaging in other activities deemed to be drug related in or in the vicinity of" his apartment.  But the probable cause inquiry requires only a "fair probability" -- not certainty -- that evidence of a crime will be found in a particular location.  See, e.g., Feliz, 182 F.3d at 86 (citation omitted).

The court correctly denied the motion to suppress.[4]

### III.

Dixon also argues that the government did not establish the interstate commerce element of the felon-in-possession charge because the district court erred in instructing the jury on that element.  But, as Dixon candidly concedes, his arguments are squarely foreclosed by our precedent in United States v. Corey, 207 F.3d 84 (1st Cir. 2000).  He raises them only to preserve them for further review.

Under Corey, Section 922(g) requires only that a defendant have possessed a firearm in a state other than the one in which it was manufactured, id. at 88 -- that is, that the defendant have possessed a firearm that has crossed state lines at some point.  See also Scarborough v. United States, 431 U.S. 563, 577

---

[4] Below, Dixon also filed a motion to suppress statements he made to police while detained during the execution of the search warrants.  On appeal, he only cursorily challenges those statements as the tainted fruits of his arrest and the subsequent searches. Because probable cause existed, however, this argument necessarily fails.

(1977) (finding that an earlier version of § 922(g) embodied only a "minimal nexus requirement"). The district court instructed the jury accordingly, and the government presented evidence at trial that the gun found in Dixon's home in Massachusetts was manufactured in Ohio and the ammunition was manufactured in either Connecticut or Arkansas. The instructions were correct and the government met its burden. No more was required.

IV.

We _affirm_ the judgment of the district court.