# United States Court of Appeals
## For the First Circuit

No. 18-1643

UNITED STATES OF AMERICA,

Appellee,

v.

ILIR BREGU,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Joseph B. Simons for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Andrew E. Lelling, United States Attorney, and Adam Sandel, Harvard
Law School, were on brief, for appellee.

January 24, 2020

**LIPEZ**, **Circuit Judge**.  Between March and July of 2015, federal law enforcement officers executed a series of five search warrants as part of an investigation into an oxycodone-distribution conspiracy involving appellant Ilir Bregu.  The officers obtained precise location data for Bregu's cell phones and recovered a large amount of cash stored in a hidden compartment in Bregu's Lincoln Town Car, confirming the government's theory that Bregu was the New York-based oxycodone supplier for his co-conspirators' Massachusetts operation.  Bregu moved to suppress this evidence on the basis that the first warrant for cellular location data, which served as the foundation for all four subsequent warrants, was not supported by probable cause.  He also argued that even if there was probable cause for the first warrant, the warrant for his vehicle was independently inadequate.  After the district court denied the suppression motion, a jury convicted Bregu of conspiracy to possess with intent to distribute and to distribute oxycodone, in violation of 21 U.S.C. § 846.

On appeal, Bregu asserts that his conviction must be vacated because the court improperly admitted the challenged evidence.  Finding no error in the district court's suppression ruling, we affirm Bregu's conviction.

## A. Factual Background

When evaluating the denial of a motion to suppress, we present the facts as supportably found by the district court. See, e.g., United States v. Pontoo, 666 F.3d 20, 24 (1st Cir. 2011).

### 1. First Warrant for Cell Phone Location Data

On March 20, 2015, the government submitted materials to a magistrate judge in support of an application for a search warrant and orders pursuant to the Stored Communications Act, 18 U.S.C. § 2703,[1] to obtain location data for Bregu's cell phone with a number ending in 5912. Specifically, the application requested (1) "precise location information" including, but not limited to, "E-911 Phase II data," for a prospective period of thirty days; and (2) "cell site location information" ("CSLI"), identifying "the antenna tower receiving transmissions from the Target Telephone and information, if available, on what portion of that tower is receiving a transmission at the beginning and end of a particular telephone call made from or received by the Target Telephone," for a prospective period of sixty days. FBI Special Agent Jason Costello's affidavit in support of the application detailed the investigation into Bregu, which commenced in July

---

[1] The Stored Communications Act permits the government to compel telecommunications providers to disclose certain phone records in connection with an ongoing criminal investigation. See 18 U.S.C. § 2703.

2012 after a confidential informant ("CI-1") reported that Bregu and an individual named Floart Mino were selling prescription narcotics, including oxycodone, which they acquired from a source in New York and transported by car to Massachusetts.

Costello's investigation of Bregu and Mino led him to three other individuals: Alwyn Kalligheri, Manuele Scata, and Mario Scata. Kalligheri was arrested and charged with possession with intent to distribute oxycodone in 2013. In his post-arrest interview, Kalligheri informed law enforcement that he sold pills out of the auto repair shop where he worked in East Boston called D&M Auto Doctor ("D&M"), with the knowledge and consent of the owner, Manuele Scata. Kalligheri stated that Mino was his supplier, and Mino's source was based in New York.

Several months later, a second confidential informant ("CI-2") informed Costello that Mario Scata had been illegally selling pills for years and continued to do so. Agent Costello determined that Mario Scata was Manuele's father and that Mario frequently spent time at D&M. Phone records also revealed that Kalligheri, Mino, Manuele, and Mario all had direct phone contact with each other in the months prior to Kalligheri's arrest.

The FBI then installed a court-authorized pen register on Mario's phone, which allowed the government to review the phone numbers of incoming calls, and a pole camera outside the Scata residence in Revere, Massachusetts, where Mario resided in the

basement apartment and Manuele resided in the second-floor apartment. Footage from the pole camera obtained in January 2015, along with periodic FBI surveillance of the Scata residence, revealed vehicle traffic consistent with street-level drug trafficking: individuals would park near the residence, walk to Mario's basement apartment, and then return to their vehicles a minute or two later and depart the area. According to Agent Costello, these transactions seemed to occur only when Mario's car was in the driveway.

Less than a month later, FBI agents observed Bregu visiting the Scata residence. His black Lincoln Town Car with New York license plates pulled into the driveway on February 3, 2015, while Mario was home. Agent Costello tracked the car when it departed approximately forty minutes later, traveling west toward New York on the Massachusetts Turnpike, and confirmed that Bregu was the driver and sole occupant. A review of Mario's phone records also revealed that shortly before Bregu arrived at the Scata residence, Mario received a short incoming call from a phone number ending in 5912, which Costello determined was Bregu's cell phone.

Later that month, a third confidential informant ("CI-3") reported to the FBI that Mario illegally sold pills to customers out of his residence, while Manuele sold pills out of D&M. To corroborate CI-3's story, Costello arranged for CI-3 to

- 5 -

make a controlled purchase from the Scatas. In late February and early March 2015, CI-3 successfully executed two controlled purchases of oxycodone from Mario's basement apartment.

CI-3 also told Costello that Mario's source of pills was an individual based in New York. Costello inferred that Mario's supplier was likely Bregu. He attempted to verify that suspicion by reviewing Mario's phone activity and the pole camera footage, which revealed that on five other occasions between late January and early March 2015, Bregu's Town Car visited the Scata residence. Each visit was preceded by a brief phone call to Mario from the 5912 number. Costello concluded that these visits were likely for the purpose of delivering pills to Mario.

In addition to recounting the foregoing investigation, Costello's affidavit in support of the warrant application described his relationship with each of the three confidential informants. He stated that he knew the identity of all three informants and had debriefed each of them. He also acknowledged that CI-1 had been federally charged with distribution of cocaine about a year after he provided the tip about Bregu to the FBI; however, CI-2 was a local police informant, and CI-3 had a history of reliable reporting for both the FBI and Massachusetts State Police. Costello concluded that the information in the affidavit established "probable cause to believe that Ilir BREGU uses the Target Telephone in furtherance of the Target Offenses." Agreeing

- 6 -

that there was probable cause, a magistrate judge approved the application and issued the requested orders and warrant on March 20, 2015. That same day, the FBI began receiving precise location information for the 5912 number.

## 2. Subsequent Warrants for Cell Phone Location Data

Over the next several months, the FBI also sought and received authorization to obtain precise location information for two other cell phones used by Bregu. Those applications were based on the same particulars of the investigation articulated in the first warrant application for the 5912 number, but each one also averred that the phone number from the preceding warrant was no longer in use and that Bregu had begun using a new cell phone for communications about drug deliveries. Thus, in total, four analogous warrants for cell phone location data were issued: the first for the 5912 number, the second for an 8432 number, the third for an 0979 number, and the fourth extending the authorized time period to collect location data for the 0979 number.

## 3. Vehicle Warrant

On July 14, 2015, the government submitted an application for a fifth warrant -- this time, to search Bregu's Lincoln Town Car.[2] Agent Costello's affidavit in support of the application attached and incorporated by reference the most recent

---

[2] The application also sought warrants to search the Scatas' apartments and Manuele's Chevrolet Tahoe.

- 7 -

application for location information for the phone number ending in 0979, which included the facts described above.

The application also contained additional facts not included in the first cell phone warrant application, some of which had been added to the applications for the third and fourth cell phone warrants. It stated that CI-3 had executed three additional controlled purchases from Mario's apartment in March and April 2015. During that time, agents also observed Bregu making four more trips from New York to the Scata residence in his Town Car. Each time, Bregu would enter Mario's basement apartment and leave approximately thirty minutes later. Pole camera footage showed that Manuele went down to Mario's basement apartment shortly before each of Bregu's suspected pill deliveries, except on two occasions, when Manuele instead handed off a plastic bag to Mario in advance of Bregu's arrival.

The application also described anomalous activity observed in the pole camera footage on April 19, 2015, leading Costello to believe that the pole camera had been detected by the Scatas.[3] After that date, Bregu and the Scatas continued to meet

---

[3] Agent Costello stated that on April 19, 2015, Manuele was observed working in, on, or near a travel trailer adjacent to his driveway, where he was not within the visible range of the pole camera. Then, two men arrived at the residence in a red sedan and walked around to the far side of the trailer where they met Manuele out of the view of the pole camera. Mario arrived home several minutes later and went to the far side of the trailer as well. All four men emerged back into view of the pole camera

regularly but changed the manner in which they did so. Specifically, on two dates in April and May, location data from Bregu's phone showed that he made trips to areas in Revere and East Boston other than the Scata residence and then returned to New York. During each trip, Bregu and Mario made contact by phone and then Manuele left the Scata residence in his vehicle for approximately forty-five minutes. Agents observed Manuele shuttling plastic bags between his car and apartment after each of Bregu's trips. Phone records and location data also indicated that Bregu and Mario had a third meeting in May. And in mid-June, pole camera and pen register activity suggested that Mario, Manuele, and Bregu had another meeting away from the Scata residence. Before and after that meeting, Manuele was observed visiting Mario's basement apartment carrying a plastic bag or object.

Finally, the application for the vehicle warrant detailed a suspicious meeting between Bregu and the Scatas in early July 2015. Just before midnight on July 7, Bregu called Mario. Mario then called Manuele, and Manuele then left his apartment

---

approximately thirty-five minutes later. The two occupants of the red sedan periodically looked in the direction of the pole camera and then walked down the street towards the pole camera and out of view. They then left the premises in their red sedan. Afterwards, agents noticed that foot and vehicle traffic consistent with street-level drug trafficking "dropped off dramatically." This led Costello to believe that the pole camera had been detected.

carrying an unidentified item and drove off. Agents followed Manuele to his auto repair shop in East Boston, where he met with Bregu in Bregu's Town Car. Shortly thereafter, Bregu and Manuele left the shop in separate vehicles and agents followed them to a gas station in Revere. Surveillance video from the gas station showed Bregu approach Manuele while Manuele pumped gas. Bregu pointed into the open driver's window of Manuele's car. Manuele nodded his head, and Bregu returned to his Town Car, removed a plastic bag from the rear seat, and walked back to Manuele's vehicle with the bag partially covered by his jacket. Bregu dropped the bag onto the driver's seat of Manuele's car, chatted with Manuele briefly, and then both men drove off.

Agent Costello averred that based on the investigation detailed above, he believed that the Town Car would contain evidence of drug dealing. On the date of the vehicle warrant application, pen registers showed multiple contacts between Mario and Bregu, which suggested that a pill delivery from Bregu to the Scatas was imminent and perhaps even scheduled for later that night. The application thus requested authorization to search the Town Car at any time of the day or night.

A magistrate judge issued the warrant the day it was requested, July 14. On July 16, law enforcement officers observed a meeting between Bregu and the Scatas at D&M. After Bregu left the scene in his Town Car, officers pulled him over and executed

the search warrant, recovering, among other things, $37,800 in cash from a hidden compartment behind the dashboard.

## B.  Procedural History

In August 2015, a federal grand jury returned an indictment charging Bregu, Manuele Scata, and Mario Scata with conspiracy to possess with intent to distribute and to distribute oxycodone, in violation of 21 U.S.C. § 846.[4]  Bregu moved to suppress the fruits of the five warrants detailed above.  The district court denied the motion after a non-evidentiary suppression hearing.

Bregu then proceeded to trial, where the government introduced the evidence Bregu had sought to suppress, and Mario Scata testified against Bregu.  A jury found Bregu guilty and the court subsequently sentenced him to seventy-two months' imprisonment followed by a thirty-six-month period of supervised release.

On appeal, Bregu argues that the district court improperly denied his suppression motion and that, accordingly, his conviction cannot stand.

---

[4] The indictment also charged both Mario and Manuele Scata with possession with intent to distribute oxycodone, in violation of 21 U.S.C. § 841(a)(1), and charged Manuele with using and carrying a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A).

## A. Standard of Review

In assessing a district court's denial of a motion to suppress, we review its findings of fact for clear error and questions of law de novo.  See United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005).  When the motion to suppress is based on an allegedly deficient warrant, we give "significant deference" to the magistrate judge's initial probable cause determination,[5] reversing only if there is "no 'substantial basis' for concluding that probable cause existed."  Id. (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).

## B. Probable Cause for First Cellular Location Data Warrant

Bregu challenges the district court's determination that there was probable cause for the magistrate judge to issue the first warrant for location data for the 5912 cell phone.  The

---

[5] When the district court considered the motion to suppress, courts were in disagreement as to whether a warrant supported by probable cause was necessary to obtain precise location data for a cell phone, as opposed to the lesser showing required by the Stored Communications Act and applicable to pen registers and trap and trace devices.  After the district court denied the suppression motion, the Supreme Court decided Carpenter v. United States, which held that acquisition of seven days' worth of historical CSLI requires probable cause but explicitly declined to express a view on the requirement for obtaining real-time CSLI.  See 138 S. Ct. 2206, 2217 n.3, 2220 (2018).  Here, the government states that "[f]ollowing the Supreme Court's decision in Carpenter, the government does not dispute that a showing of probable cause was necessary to obtain the precise location information the government sought."

thrust of Bregu's argument on appeal is that the information contained in Agent Costello's affidavit primarily concerned the Scatas, not Bregu, and the only incriminating information about Bregu came from CI-1, who was not a reliable informant. Bregu also argues that the district court erred in failing to apply the enumerated factors for testing probable cause in an affidavit that relies "mainly" on information from confidential informants. See United States v. Tiem Trinh 665 F.3d 1, 10 (1st Cir. 2011). He asserts that proper application of those factors would have undermined the magistrate judge's probable cause finding. We disagree.

A warrant application must establish "probable cause to believe that (1) a crime has been committed -- the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched -- the so-called 'nexus' element." Ribeiro, 397 F.3d at 48 (quoting Feliz, 182 F.3d at 86). In asking whether probable cause existed, courts look at the "totality of the circumstances." See United States v. Rivera, 825 F.3d 59, 63 (1st Cir. 2016) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). This approach reflects the fact that "probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232.

- 13 -

To aid this analysis in cases where a warrant application relies "mainly" on confidential informants, we have articulated four factors for consideration:

> (1) whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information, (2) whether an informant's statements reflect firsthand knowledge, (3) whether some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable, and (4) whether a law enforcement affiant assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's provided information.

Tiem Trinh, 665 F.3d at 10 (alteration in original) (citations omitted) (internal quotation marks omitted). These factors constitute a "nonexhaustive list," and no single factor is indispensable. Id. Accordingly, rigid or mechanical application of the factors is not required, and "stronger evidence on one or more factors may compensate for a weaker or deficient showing on another." United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996).

In this case, we cannot say that the affidavit relied "mainly" on confidential sources, as in Tiem Trinh. See 665 F.3d at 10. The affidavit contained exhaustive information implicating Bregu in an oxycodone-distribution conspiracy with the Scatas, even in the absence of CI-1's tip that Bregu was selling oxycodone. Together, pen register data from Mario's phone combined with pole

- 14 -

camera footage from outside the Scata residence established a pattern -- at least five times in less than three months -- in which Bregu made brief contact with the Scatas by phone and then traveled from New York to their home in Revere, where he stayed for just a short period of time before driving back to New York. That the purpose of Bregu's visits to the Scatas was to supply them with oxycodone pills was further supported by both Kalligheri and CI-3's statements that the supplier for Mino and the Scatas was based in New York, not to mention the fact that CI-3 successfully executed two controlled purchases of oxycodone from the Scatas just days after two of Bregu's brief visits.

However, we also do not read the district court's opinion as neglecting the Tiem Trinh factors. By noting that all three confidential informants were known to Agent Costello and that he debriefed each of them, as well as detailing the means by which their information was corroborated, the district court effectively addressed several of the factors and found that they tended to establish probable cause.

We agree with this determination. Collectively, the information in the warrant application about Bregu's pattern of behavior, gleaned from the pole camera footage and Mario's phone records, and supplemented by first-hand accounts from Kalligheri, CI-2, and CI-3, served to corroborate the tip provided by CI-1. See United States v. Monell, 801 F.3d 34, 39 (1st Cir. 2015)

(stating that confidential informants can corroborate one another's stories). Agent Costello's knowledge of CI-1's identity also supported the reliability of his information because Costello could hold CI-1 responsible if he provided false information. See United States v. Greenburg, 410 F.3d 63, 67 (1st Cir. 2005). And although CI-1's information was over two years old, all of the surveillance of Bregu's interactions with the Scatas occurred in the months, weeks, and days immediately preceding issuance of the first cell phone warrant, supporting the ongoing accuracy of CI-1's information. See United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992) ("Staleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material."), abrogated on other grounds by Cleveland v. United States, 531 U.S. 12 (2000).

Accordingly, we hold that the information in the warrant application, considered in the totality of the circumstances, was sufficient to support a finding of probable cause to believe that precise location data from Bregu's cell phone would provide evidence showing that Bregu was the New York-based supplier for the Scatas' oxycodone trade. We thus affirm the district court's decision not to suppress the fruits of the first warrant, including the location data gleaned from the three subsequent cell phone warrants that relied on the first one.

## C. Probable Cause for the Vehicle Warrant

Bregu also argues that the warrant for his Lincoln Town Car was not supported by probable cause and that the items seized from it should have been excluded from evidence. He contends that the information in the warrant application was insufficient to satisfy either of the two prongs of the warrant requirement: a showing of probable cause that (1) a crime had been committed, and (2) the Town Car would contain evidence of that crime, i.e., the oxycodone conspiracy. See Ribeiro, 397 F.3d at 48.

The so-called "commission" element requires little elaboration. The application for the vehicle warrant contained all the same background information as the application for the first cell phone warrant -- with added incriminating information about Bregu. It reported his four additional trips to Mario's apartment, noted that several of his visits were preceded by hand-offs of plastic bags from Manuele to Mario, and detailed an encounter in which Bregu was observed removing a plastic bag from his Town Car, hiding it under his coat, and placing it on a seat in Manuele's car just before midnight at a gas station. These facts amply support the magistrate judge's determination that there was probable cause to believe that Bregu had committed a crime.

As for the second prong -- requiring probable cause to believe evidence of the crime would be found in the place to be

searched -- Bregu argued before the district court and in his opening brief that the warrant should have been issued as a limited "anticipatory warrant." An anticipatory warrant is "a warrant based upon an affidavit showing probable cause that at some future time (but not presently) certain evidence of crime will be located at a specified place." United States v. Grubbs, 547 U.S. 90, 94 (2006) (quoting 2 Wayne R. LaFave, Search and Seizure § 3.7(c) (4th ed. 2004)).

Thus, Bregu asserted that the vehicle warrant should have explicitly authorized its execution only during or after a meeting between Bregu and the Scatas, as opposed to "at any time of the day or night."[6] He based this assertion on our holding in United States v. Ricciardelli, 998 F.2d 8 (1st Cir. 1993), that an anticipatory warrant must expressly condition its execution on the occurrence of the triggering condition. Id. at 11-13. However, in United States v. Grubbs, the Supreme Court overruled this aspect of Ricciardelli. See 547 U.S. at 98. Grubbs rejected the notion that an "anticipatory warrant" must delineate the triggering condition on its face, holding that the Fourth Amendment's particularity requirement does not require warrants to "include a specification of the precise manner in which they are to be

---

[6] Notably, the warrant was executed in precisely this fashion -- immediately after an officer observed a meeting between Bregu and the Scatas at D&M.

executed." Id. (quoting Dalia v. United States, 441 U.S. 238, 257 (1979)).

Bregu conceded this point at oral argument, noting that Grubbs limits any advantage he might have gained from the "anticipatory warrant" framework. Accordingly, we evaluate the nexus element in the familiar way, examining "whether, given all the circumstances set forth in the affidavit . . . there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." Gates, 462 U.S. at 238. The magistrate judge's task was "simply to make a practical, common-sense decision" based on the facts before him, and our duty "is simply to ensure that the magistrate [judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238-39 (ellipsis and second alteration in original) (quoting Jones v. United States, 362 U.S. 257, 271 (1960), overruled in part on other grounds by United States v. Salvucci, 448 U.S. 83 (1980)). In this context, "common sense says that a connection with the search site can be deduced 'from the type of crime, the nature of the items sought,' plus 'normal inferences as to where a criminal would hide' evidence of his crime." Rivera, 825 F.3d at 63 (quoting Feliz, 182 F.3d at 88).

The application for the vehicle warrant met this requirement. All of Bregu's transactions with the Scatas involved Bregu's Town Car. Indeed, based on FBI surveillance and the pole

camera footage, the Town Car was Bregu's sole means of transportation between New York and Massachusetts. Bregu never stayed more than thirty to forty minutes when he visited the Scatas before driving home to New York, suggesting that any contraband delivered or received would be found in Bregu's car, as opposed to a hotel room or some other location in the area. Most importantly, the affidavit provided a detailed account of a surreptitious exchange between Bregu and Manuele caught on video, in which Bregu removed an item from his Town Car, hid it under his jacket, and then left it in Manuele's vehicle. It also stated that on the date of the warrant application, pen registers showed multiple contacts between Mario and Bregu, suggesting that a pill delivery was imminent. Thus, common sense dictates that some time within the two weeks following the warrant application,[7] Bregu would drive his Town Car into the authorized jurisdiction (the District of Massachusetts) and the car would contain oxycodone, U.S. currency, cellular telephones, and/or documents describing Bregu's drug suppliers and customers. Based on the pattern observed by the FBI, there was probable cause to believe that Bregu was supplying the Scatas with oxycodone and bringing it to them in his Lincoln Town Car, which he drove every single time.

---

[7] The warrant stated that it must be executed within fourteen days of its issuance. See Fed. R. Crim. P. 41(e)(2)(A)(i).

We thus find that the warrant for Bregu's vehicle was properly issued, and therefore the evidence seized from it was properly admitted at trial.  Accordingly, we affirm Bregu's conviction.

So ordered.